IN THE

# COURT OF APPEALS

OF

# MARYLAND.

DECEMBER TERM, 1841.

### SAMUEL LUCAS et al. vs. MICHAEL MCBLAIR et al.—
### December 1841.

By the act of 1838, chap. 323, commissioners were appointed by name to build a Town Hall in Baltimore, and with power, by a scheme or schemes of lotteries and sales thereof, or tickets therein, to raise the sum of, &c. These schemes were to be approved of by the Commissioners of Lotteries. By the act of 1839, confirmed in 1840, it became a part of the Constitution of Maryland, that "no new grant to authorize the drawing of any lottery, or the traffic or dealing in lottery tickets, or schemes or devices in the nature of lotteries, &c., shall be made." The commissioners of lotteries were public officers of annual appointment. By bill filed in 1841, the *Town Hall Commissioners* complained, that while they were endeavouring to sell the tickets in their schemes, the *Commissioners of Lotteries*, since the acts of 1839-40, "approved, and allowed to be availed of, (and allowed tickets therein to be sold under licenses,) *schemes of lotteries for the State of Maryland, and schemes of lotteries granted and authorised by other States than Maryland;* stamped tickets in such schemes, and issued them to contractors for sale, and under pretext of licenses emanating from such *Commissioners of Lotteries,* that the same were largely sold, thereby violating the acts of 1839-40, also seriously interfering with the sales of the complainants, in their Town Hall schemes authorised by the act of 1838. To restrain this evil their bill prayed for an injunction against the *Commissioners of Lotteries,* and the persons licensed by them, in relation to the approval of tickets in the lotteries for this *State and other States,* and

1    v.12

sales of tickets therein and granting licenses therefor.   Upon this it was *held*—

That considering the difficulty of obtaining adequate redress at law, and the probability that a multitude of suits would necessarily be instituted to protect the complainants' franchise, the process of injunction was a proper remedy.

That as trustees, invested by law with an important public duty, they were competent, as parties, complainants, to proceed in equity in their own names, to protect the franchise committed to them from violation.

The State was not necessary party to the bill in order to obtain an injunction.

It was the object of the act of 1839, chap. 39, to prohibit in future, all lottery grants by the Legislature, and all grants of licenses to deal in lotteries by the lottery commissioners, so far as it could be done without affecting antecedent or prior vested rights, secured by a constitutional sanction.

The difficulty of obtaining adequate redress in a court of law is one of the well established grounds for resorting to a Court of Chancery, and especially where in the pursuit of justice it may be necessary to resort to a multiplicity of actions at law.

A statute privilege, in possession, of an exclusive character, not admitting of an injurious competition, may in its use and enjoyment be protected by injunction, equally essential in such cases to prevent ruinous litigation, as fraud and evasion of the right.   A franchise to propose a scheme of a lottery and sell tickets for a particular object, is so far of an exclusive nature, as to be within the principle above stated.

The act of 1828, chap. 129, sec. 21, recognizes the propriety of a resort to the writ of injunction in such cases.   To prevent irreparable injury or multiplicity of suits, are grounds for obtaining an injunction.   This preventive remedy is now granted more liberally than formerly.

Commissioners appointed by law—invested with a public trust—with means for its execution—with full power to act—must be entitled to use all the appropriate means necessary to the end in contemplation, and are regarded as having such an interest in the subject confided to them, as will enable them to proceed before the tribunals of the country, for the due protection of the rights entrusted to them.

It is not necessary in all cases, that the *cestui que trusts* or parties beneficially interested, should be parties to a bill in equity.

Executors and administrators who may sue, or be sued, in many cases sufficiently represent creditors, legatees or distributees, for whom they are trustees.

The want of a party as a defendant, is generally no ground upon which to claim a dissolution of an injunction ; a necessary party may be supplied before final hearing.

It is the constant aim of courts of equity to do complete justice, by deciding upon and settling the rights of all parties interested in the subject matter

of the suit, but this may be obtained by having the necessary parties before the court at any time before the final decree is passed.

If all persons interested are not made parties to the suit, the court many times, upon hearing, will not for want of them proceed to a decree.

The act of 1839, chap. 31, was not confined to grants of lottery privileges by the Legislature, but was intended to cover the whole system of dealing in lotteries, and to prohibit the granting of licenses by the Lottery Commissioners, and the sale of schemes by them, except as to existing private lottery grants; and the power the Legislature before possessed of regulating such private grants, and the means by which they might be more effectually and speedily accomplished.

Where the object of the Legislature in passing a statute, was the suppression of a great moral evil, the construction of it should be benign and liberal, and not so restricted as to leave much of the mischief designed to be suppressed, the chance of still being successfully pursued.

The title and preamble of an act are, strictly speaking, no parts of it, though they may be resorted to in explanation of the enacting clause, if it be doubtful; or to restrain its generality, when it would be inconvenient if not restrained.

APPEAL from Chancery.

On the 4th December, 1841, *Samuel Lucas, William Gwynn, Charles G. Ridgely, Oliver Holmes, George G. Bell* and *Chas. F. Mayer,* exhibited their bill of complaint against *Michael McBlair, George Cooke, Samuel Scribner, Henry M. Bash, William Pyfer* and *J. G. Gregory,* and other persons composing the partnership of *J. G. Gregory and Company,* alleging, that by an act of the General Assembly of *Maryland,* passed at December session of 1838, chapter 323, entitled, An act in aid of the construction of a State Armory and Town Hall in the city of *Baltimore,* and the re-building and improvement of the Hanover Market House in said city. Your orators (excepting *Holmes,*) were appointed commissioners for the purpose of raising, by sales or drawing of schemes of lotteries, the requisite sum of money for the construction of the State Armory and Town Hall, which for the public convenience and defence, it was the purpose of said act to have erected. And your orators further show, that at their December session, 1839, chap. 52, an act supplemental to that just mentioned, was passed by said General Assembly, extending the term of operation of the original act, and of the privileges and rights

conferred by said act.    And your orators pray reference to said
original and supplemental acts, as they appear in the printed
compilations of the acts of the aforesaid sessions, and that they
be deemed and taken as part of this their bill.    Your orators
now further state, that the *Mayor and City Council of Balti-
more,* whose property and interest are to be availed of, and to
be affected by the said acts, and by the structure by the same
required, did, in consideration that said structures should be
made, become a party to said acts of Assembly, and grant
their assent, and the privilege and control to the said commis-
sioners in respect of the use of the ground and property of said
corporation, which are contemplated in the fourth section of
the said original act.    And your orators state, that thereupon,
and to accomplish the project so devised and ordained by the
*State of Maryland,* and through the said assent and concession
of said corporation, so stipulated for by the *Mayor and City
Council of Baltimore,* the commissioners aforesaid proceeded
to make contracts with persons for purchase of schemes of
lotteries so authorised, which contracts were performed; and
finally to cause schemes of lotteries to be drawn under their
own direction, they by their agents selling the tickets therein.
And your orators aver, that as commissioners under the acts
aforesaid, they are now engaged in carrying out the objects of
said acts, by sales in manner aforesaid, with reference to the
said purpose of the General Assembly, and of the *Mayor and
City Council of Baltimore.*    And your orators give your honor
to know, that *Solomon Hillen,* who by said original act was
appointed one of said commissioners, resigned his said office,
and that *Oliver Holmes,* your orator, was duly appointed a
commissioner in his place, giving bond with approved securi-
ty, as did each of your orators, according to the requirements
of said acts of Assembly.    And your orators suggest, that be-
ing thus the constituted agents of an undertaking of much
public importance, and which it is the view of the *State of
Maryland* and of the *Mayor and City Council of Baltimore* to
have accomplished as promptly as may be, and for which it is
the policy and intent of said acts, that means should be pro-

cured as largely and surely as practicable, your orators are specially interested in seeing maintained all the restrictive provisions of the law and Constitution of *Maryland* touching the privilege of lotteries. And now your orators show, that certain officers, by virtue of enactments of the General Assembly of *Maryland*, have been from time to time appointed, and now are officiating, called commissioners of lotteries, representing the State in reference to the revenue derivable to her from drawings of lotteries and sales of schemes, and licenses for selling lottery tickets, whose duties however, are particularly defined and prescribed in the several relevant acts of Assembly, to which in that respect your orators refer; your orators chowing, that the actual commissioners now are, *Michael McBlair* and *George Cooke.* Your orators further show, that by the first section of the acts of the General Assembly of *Maryland*, passed at December session 1831, chap. 79, entitled, An additional supplement to an act to amend the lottery system, the said commissioners are empowered to grant at any time after the passage of said act, a license or licenses to any person or persons, to be in force for one year from the date of the grant thereof, to sell not only tickets in any scheme or schemes of a lottery or lotteries which the said commissioners shall form and dispose of, or authorise for the benefit of the State, but also to sell tickets in any scheme or schemes of a lottery or lotteries granted by any of the States of the Union, or by the *United States of America*, and submitted to and approved by said commissioners, it being further provided, that the person or persons so licensed, shall at or before the obtaining of the licenses, contract with the commissioners aforesaid, for the right to draw a scheme or schemes of a lottery or lotteries within the year for which the license shall be granted, which scheme or schemes shall produce to the State, at least the sum of fifteen thousand dollars within said year. And your orators now state, that in pursuance of the provision of law just recited, the commissioners of lotteries have habitually made contracts with certain individuals, for the benefit of such individuals, of certain schemes of lotteries, devised or approved by

the commissioners in behalf of the State; and with reference
to the yearly profit of at least fifteen thousand dollars, contem-
plated to be assured to the State by the terms of the act refer-
red to; such schemes being thus created and operative for the
benefit of the *State of Maryland;* and the fruit and profit there-
of commuted by the contracts aforesaid, made by the commis-
sioners as aforesaid, with certain individuals. And your orators
show further, that conformably to said acts of Assembly, the
commissioners of lotteries have been accustomed to grant li-
censes to said contracting individuals, authorising them or their
assignees of the licenses, to sell tickets of lotteries of the State
as aforesaid, or of foreign lotteries of other States, or of the
*United States,* within the scope of the provision already herein
before set forth, as to those licenses. And your orators state
and charge, that under licenses so granted by the commission-
ers of lotteries, and under colour of the said act of Assembly,
tickets have ever since the passage of said act been sold, and
are now selling within the city of *Baltimore* and in the *State
of Maryland* at large, in schemes of lotteries for the State's use
as aforesaid, and of lotteries granted and sanctioned by only
other States of this Union, or by the *United States of America,*
such sales being made not only by the contracting individuals,
and the grantees of the State of the said licenses, by numerous
assignees of said licenses, under transfer of them respectively
from said contractors. And your orators further show, that
the contractors aforesaid, for the disposal of said licenses, and
the sale of tickets to those using the licenses aforesaid, as gran-
tees of said contractors, have customarily had, and now have,
agents in the city of *Baltimore,* such agents receiving from the
commissioners of lotteries the tickets of the various schemes;
that the commissioners have approved for the dealing of said
contractors and the holders of said licenses, the tickets so de-
livered, being stamped by said commissioners in token of the
approval of the schemes, as required by the act of Assembly
aforesaid, of the year 1831. And your orators state, that the
persons who have contracted as aforesaid with the commis-
sioners of lotteries, and have so contracted since the tenth day

of March, in the year 1841, the day of the passage by the said General Assembly of the act hereinafter mentioned, entitled An act to confirm an act entitled, an act to alter and amend the Constitution, so far as it relates to the power of the Legislature to grant lotteries, passed at December session 1839, chap. 31, are *J. G. Gregory* and other persons, to your orators unknown, composing the partnership of *J. G. Gregory and Company;* and that the agents aforesaid of said contractors, acting and managing for them, in manner aforesaid, in the city of *Baltimore*, are *Samuel Scribner*, and *William Pyfer* and *Henry M. Bash*, doing business as such agents and managers, under the style of partnership, of *S. Scribner and Company.*   And your orators state and charge, that at the December session of the year 1839, the General Assembly of *Maryland*, contemplating the evils of unlimited lottery dealings, and of the multiplied lotteries agitating and alarming the community, and absorbing their means in many instances, to be diverted to objects of other States, and to be accomplished beyond the borders of *Maryland*, and repudiating as a source of revenue to the State, the fruits of such inordinate dealing, struck from the ordinary powers of legislature the sanction of lotteries, by passing the act entitled, An act to alter and amend the Constitution, so far as relates to the power of the Legislature to grant lotteries, declaring, that from and after the confirmation of that act by the succeeding Legislature, "no new grant should be made to authorise the drawing of any lottery, or the traffic or dealing in lottery tickets, or schemes or devices in the nature of lotteries, or the distribution of money or property by chance ;" and your orators state, at the next succeeding session of the Legislature, on the tenth day of March, in the year 1841, by an act entitled as above, an act to confirm the aforesaid act of the session of 1839, chap. 31; the act aforesaid forbidding to the Legislature the power of lottery grants, was confirmed and made part of the Constitution of *Maryland;* and the State itself, disabled from continuing the practice of lottery dealing, and drawing to the treasury the premium of the mischief which the Constitution thus marked and denounced.   But your orators charge, that

notwithstanding this constitutional condemnation and inhibi-
tion, the commissioners of lotteries, although the agents of the
State, who has thus interdicted herself the privilege and profits
of lotteries, have nevertheless, in continuance of the evil repu-
diated by the constitution, entered into contracts of the same
scope as those permitted before this Constitutional ordinance,
and have approved and allowed to be availed of, (and allowed
tickets therein to be sold under licenses as aforesaid,) schemes
of lotteries for the State of *Maryland*, and schemes of lotteries
granted and authorised above by other States, and have stamp-
ed as aforesaid tickets in such schemes, and issued them to the
contractors or their agents aforesaid, which contractors and
agents your orators have above named.   And your orators aver
and charge, that by sanction as aforesaid by said commission-
ers of lotteries, and by the instrumentality of said contractors
and said agents, and under pretext of the licenses aforesaid,
emanating from said commissioners of lotteries, schemes are
every week approved for State lotteries aforesaid, and of lot-
teries granted and authorised above by other States, and tickets
are largely and busily sold under many licenses issued as afore-
said, by said commissioners of lotteries to said contractors, and
from them passing to the numerous grantees of the licenses,
said commissioners stamping and authenticating thus, or by
signature, the tickets so set afloat; and thus affording every
ostensible warrant and all encouragement to a transgression of
a solemn constitutional rule, and misinterpreting and exceed-
ing the limits of their constitutional duty, as agents of the State.
And your orators aver and charge, that by such action of said
commissioners of lotteries and of the agents and persons afore-
said, not only is that social injury done which the Constitution
so studiously sought to avert, but the [undertaking to which,
as aforesaid, your orators have been appointed as representa-
tives of important purposes of the State and of the city of *Balti-
more*, and which the State seeks to promote, has been seriously
retarded, and its interests much prejudiced; and your orators
aver and charge, that the project aforesaid of the State, over
which they, as aforesaid, preside, must be long delayed, if not

utterly intercepted for its accomplishment, if the unconstitutional procedure aforesaid, of which your orators now complain, be not arrested. All which is much to the grievance of your orators; in tender consideration whereof, and forasmuch as no effectual remedy can be afforded in the premises, except in this honorable court.

To the end, therefore, that said *Michael McBlair* and *George Cooke*, and said *J. G. Gregory* and the other persons, his partners as aforesaid, and *Samuel Scribner*, and *Henry M. Bash*, and *William Pyfer*, may on oath, answer the premises, and that said *McBlair* and *Cooke*, commissioners as aforesaid, may be perpetually enjoined from approving any schemes of any lotteries granted by any of the States of the Union, or by the *United States of America*, and from devising and approving, and authorising the drawing of any schemes of lotteries for the State of *Maryland* and the benefit thereof, as contemplated by the said act of Assembly, passed at the session of the year 1831; and that said *McBlair* and *Cooke*, as commissioners, be so enjoined from countersigning or stamping, or by any mark or token whatsoever, approving or authenticating any tickets in any schemes of any lotteries as aforesaid, granted by other States than *Maryland*, or by said *United States*, or in any schemes devised by, or proposed to, or approved by said commissioners, for the benefit of the State as aforesaid; and further, that said *Scribner*, and *Bash*, and *Pyfer*, be perpetually enjoined from issuing or delivering, or selling or disposing of, or in any wise parting with any tickets of any lottery or lotteries granted by another State than as aforesaid, or by said *United States*, whether such tickets be or be not approved or stamped or countersigned by said commissioners, or either of them, and whether the schemes of such lotteries be or be not approved by said commissioners; and in like manner that they be so enjoined in respect of any lotteries or schemes or tickets thereof, or therein devised or approved by said commissioners of lotteries, for the benefit of the State of *Maryland* as aforesaid; and further, that said *J. G. Gregory* and the other persons, his partners as aforesaid, be in like manner perpetually

enjoined in respect of any such lotteries or schemes or tickets therein and thereof, as to which such injunction is above prayed and suggested against said *Scribner*, and *Bash*, and *Pyfer;* and that your orators may have such further and other relief in the premises as to your honor may seem right.    Subpœna and order of publication, &c.    The bill was sworn to by three of the complainants.

On which bill the Chancellor (Bland) passed the following order:

The State not being represented by its Attorney General, being made a party, no injunction can be granted as prayed by the foregoing bill of complaint.

. Afterwards, on the 8th December, 1841, the complainants filed in the said cause the following order of the Honorable Stevenson Archer, one of the Judges of the Court of Appeals.

"Upon the aforegoing proceedings, it appearing to me that " the Chancellor has erred in refusing to grant the injunction " prayed for, it is ordered this 7th day of December, 1841, " that the Register in Chancery, do issue the injunction as " prayed in the bill, upon the complainants, or some of them, " executing a bond with security to be approved by the Chan- " cellor, in the penalty of five thousand dollars, conditioned to " prosecute their injunction with effect, and pay and satisfy " the defendants, all costs to which they may be subjected by " said injunction, and also pay and satisfy all damages which " they or either of them, or the State may sustain by the grant- " ing and continuance of this injunction."

Afterwards, upon the petition of the complainants, the said Judge of the Court of Appeals approved of an injunction bond, &c., and directed the Register of the Court of Chancery to issue an injunction as prayed in the complainants' bill.

In pursuance of the said order, an injunction was issued in the usual form.

The defendants appeared and filed their answers.    But as those answers are not referred to by the opinion of this court in its disposition of the cause, the reporters deem it unneces-

sary to publish them. Upon motion at the usual time, His Honor the Chancellor, dissolved the injunction, and the complainants having obtained an order from his honor, ARCHER, Judge, prosecuted the appeal to this court.

The cause was argued before BUCHANAN, C. J., STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, J.

By NELSON, MAYER, and R. JOHNSON, for the appellants.

Who relied upon the act of 1839, chap. 31. "An act to alter and amend the Constitution so far as relates to the power of the Legislature to grant lotteries," viz:

Sec. 1. Be it enacted, &c., that from and after the confirmation of this act &c., no new grant to authorise the drawing of any lottery, or the traffic or dealing in lottery tickets, or schemes or devices in the nature of lotteries, or the distribution of money or property by chance, shall be made, confirmed by the act of 1840, as prohibiting the defendants, the Lottery Commissioners of *Maryland,* from entering into any new contracts for the sales of lottery tickets, or granting any further licenses for such objects.

Sec. 2. That the State, in the name of the Attorney General, was not a necessary party to the cause, and that if proper to be made a party, the objection cannot be availed of to effect a dissolution of the injunction.

By McMAHON and W. SCHLEY for the appellees, who contended—

1. That this was not a proper forum before which the complainants should have sought redress.

2. That if the court had jurisdiction, the State, or the Attorney General as the representative of the State, was a necessary party.

3. That the Town Hall Commissioners have no such interest in the subject matter of this controversy as would enable them to apply for a writ of injunction.

4. That the construction given to the act of 1839, chap. 31, was erroneous. The Lottery Commissioners could still grant

licenses and still renew them. The acts of 1838, chap. 323, and 1839, chap. 52, under which the Town Hall Commissioners claimed to proceed, will be found in 11 *Gill & Johnson's Reports,* 515, &c., and to which the reader of this case is referred.

STEPHEN, J., delivered the opinion of the court.

The decision of four questions will we think cover the whole ground of controversy in this case. Those questions involve—

The right and jurisdiction of the court to grant the preventive process of an injunction, as an appropriate remedy to arrest the mischief of which the appellants complain:

The true construction of the constitutional amendment inhibiting lottery grants and the dealing in lottery tickets in this *State:*

The competency of the complainants in point of interest, to sustain the suit, and—

The propriety of the *State's* being represented by its Attorney General, as a necessary party to the proceeding.

In reference to the *first* question, we think that a court of equity was the proper tribunal to take cognisance of the case; and that the prohibitory process of an injunction was the proper remedy to arrest the *gravamen.*

The difficulty of obtaining adequate redress in a court of law, is one of the well established grounds for resorting to a court of chancery; and more especially, where it may be necessary, in the pursuit of justice, to institute a multiplicity of actions for that purpose. The injury complained of in this case would necessarily lead to that result, if redress should be sought in a court of common-law jurisdiction; and it is mainly upon that ground, that an injunction is held to be the proper remedy, to secure to a party the enjoyment of a statute privilege, where it is of an exclusive character, and does not admit of any injurious competition. In 1 *John. Rep.* 615, Chancellor *Kent* says, "it is settled that an injunction is the proper remedy to " secure to a party the enjoyment of a statute privilege, of " which he is in the actual possession, and when his legal

"title is not put in doubt. The *English* books are full of "cases arising under this head of Equity Jurisdiction." In the same case, he says: "The equity jurisdiction in such a "case is extremely benign and salutary; without it, the party "would be exposed to constant and ruinous litigation; as well "as to have his right excessively impaired by frauds and eva- "sion." It is true the right, which the complainants seek to protect from violation in this case, is not one absolutely and entirely exclusive in its nature, but it possesses the quality and attribute of exclusiveness, at least to a qualified extent; and sufficiently so, we think, to render the principle and practice, upon which the equity jurisdiction is founded, not inapplicable. It is moreover not unworthy of consideration, that the jurisdiction of a court of equity to apply a preventive remedy in this case, has, to a considerable extent, received the sanction of the Legislature in the act of 1828, chap. 129, sec. 21, where they direct an injunction to be obtained, to prevent or restrain the drawing of lotteries, which may be unauthorised by the laws of this State. The remedy by injunction, is there spoken of, as one already in existence, and not for the first time given or created for the purpose by that act. In a case of ordinary trespass, remedial justice, in the shape of damages, is only to be obtained in a court of law; but it is now settled, that where the injury would be irreparable, or to prevent a multiplicity of suits, the interference of a court of equity may be obtained to stay the mischief by the preventive process of an injunction. See 6 *John. C. Rep.* 499. In this case Chancellor *Kent* observes, that Lord *Eldon* said in 7 *Ves.* 305, that the law as to injunctions, had changed very much, and they had been granted much more liberally than formerly. We think, therefore, that under the peculiar circumstances of this case, considering the difficulty of obtaining adequate redress at law, and the probability that a multitude of suits would necessarily be instituted to protect the complainants franchise, supposing it to exist, (which upon the present occasion must be assumed to be the case,) the process of an injunction was properly applied to arrest the mischief of which the appellants complained, and that a court of equity had jurisdiction to grant the writ.

The next question to be considered, is the competency of the complainants to file the bill to obtain the interference of a court of equity, to protect them in the use and enjoyment of a statute privilege, of which they were trustees for great and important public purposes.

By the act of Assembly under which they received the appointment of commissioners, they were invested with a highly responsible public trust; the due and faithful execution of which depended upon maintaining inviolate, the lottery privilege which had been granted to those for whom they were constituted agents, with full power and authority to act in that capacity. A large sum of money was to be raised by the lottery grant, to enable them to accomplish the object of their appointment, and in the language of the law, full power and authority were given to them for that purpose. To enable them to execute this important trust, all the appropriate means necessary to that end ought to be considered as incidentally granted, so far at least as the necessity of making parties of their principals may be involved. As trustees cloathed with an important trust, we think they had a sufficient interest in the subject matter of the suit, to enable them to file a bill for the purpose of obtaining an injunction.

According to the principles of equity jurisprudence, it is not necessary in all cases, that the *cestuique trust*, or parties beneficially interested, should be parties to the suit. A familiar instance to the contrary exists in the case of executors and administrators, who may sue or be sued, as sufficiently representing the creditors, legatees, and distributees, for whom they are trustees. In *Story's Eq. Plead.* 138, it is said: "It has "been well remarked by an eminent author, in many cases, "that the expression, that all persons interested in the subject "must be parties to the suit, is not to be understood as ex- "tending to all persons who may be consequentially interested. "In all cases of bills by creditors, and legatees, the persons en- "titled to the personal assets of a deceased debtor, or testator, "after payment of the debts or legacies, are not deemed ne- "cessary parties, though interested to contest the demands of

" the creditors and legatees." In page 139, the same author remarks : "Perhaps the true explanation of this doctrine is, " that in cases of this sort, courts of equity proceed upon the " analogy of the common law, which treats the personal re- " presentative of the deceased debtor or testator as the regular " representative of all the persons interested in the personal " assets, and bound by his *bona fide* acts, so far as third per- " sons are concerned. If so, the doctrine stands upon a very " intelligible and reasonable footing; and we shall presently " see, that in this view, it is not peculiar to this class of cases. " And this leads us in the next place to suggest, that courts " of equity do not require that all persons having an interest in " the subject matter, should under all circumstances, be before " the court as parties. On the contrary, there are cases in " which certain parties before the court are entitled to be " deemed the full representatives of all other persons, or at " least so far as to bind their interests under the decree, al- " though they are not or cannot be made parties. Thus, for " example, where real estate had been purchased by a joint " fund, raised by a subscription in shares of more than two " hundred and fifty subscribers, and the property had been " conveyed to certain persons as trustees for the subscribers ; " and afterwards a bill was brought against the trustees for the " sale of the real estate, under a mortgage made in pursuance " of the trust, it was held, not necessary for the subscribers to " be made parties to bill; for the trustees, by the very nature " and constitution of such a trust, must be held sufficiently to " represent the interest of all the subscribers, and a different " doctrine would be attended with intolerable hardship and in- " convenience, as it might be impossible to make all the sub- " scribers parties." So, in page 171, the principle is stated to be in accordance with the above doctrine, that "where a " mortgagor has conveyed his equity of redemption to trustees, " for the benefit of his other creditors, the trustees alone are " generally the proper parties to a bill to redeem; and not any " of the creditors entitled under the trust." We therefore think, that under the circumstances of this case, the complain-

ants, as trustees invested with full and plenary power to execute the undertaking confided to their management, had a competent standing in court, to ask for and to obtain the injunction, which was granted in this case.

The objection that the *State* ought to have been a party to the proceeding, is of no avail at the present stage of the suit. In other words, it is no ground upon which to claim a dissolution of the injunction. If a necessary party to the cause which it is now not necessary to decide, that defect may be supplied at any time before the final hearing. It is true, it is in all cases the constant aim and object of courts of equity to do complete justice, by deciding upon and settling the rights of all persons interested in the subject matter of the suit, so that the performance of the decree of the court may be perfectly safe to those who are compelled to obey it, and also that future litigation may be prevented, and a decree made which shall bind all; but this object may be attained by having the necessary parties brought before the court at any time before the final decree is passed in the cause. And if all persons interested are not made parties to the suit, the court many times, upon hearing, will not for want of them, proceed to a decree. See *Wyatt's Chan.* 299.

There remains but one other question to be considered and decided to make a final disposition of the matters in controversy in this case; and that is, the construction which ought to be given to the constitutional amendment upon the subject of lotteries.

We have no doubt, that it was the object and policy of the Legislature, in adopting that amendment, to prohibit in future, not only all lottery grants by the Legislature, but all grants of licenses to deal in lotteries by the Lottery Commissioners, so far as it could be done, without affecting antecedent or prior vested rights, secured by a constitutional sanction. In confirmation of this construction, we would remark, that as early as the year eighteen hundred and thirty-five, they expressed an anxious desire that the lottery system should expire at as early a day as practicable, and to effectuate that desire, and extir-

pate the whole system, the constitutional amendment was, we think, subsequently adopted.

By the act of 1831, chap. 79, the Commissioners of Lotteries are authorised to grant licenses to sell tickets, either in foreign or domestic lotteries, to be in force for the term of one year from the date thereof; and by the constitutional amendment, which originated in 1839, chap. 31, and was confirmed in 1840, chap. 261, it is provided, that "no new grant shall " be made to authorise the drawing of any lottery, or the traffic " or dealing in lottery tickets, or schemes, or devices in the " nature of lotteries, or the distribution of money or property " by chance." This language, we think, is too explicit to be misunderstood. The term grant, is used indiscriminately as applicable, not only to the drawing of lotteries, but to licenses to sell tickets in any scheme or schemes of lotteries, which shall be approved by the said commissioners. The prohibition, therefore, was not exclusively confined to grants of lottery privileges by the Legislature, but was manifestly intended to cover the whole system of dealing in lotteries, and to prohibit likewise the granting of licenses to sell tickets by the Lottery Commissioners, and the sale of schemes by them. No other construction would, we think, be warranted by the terms used, or be calculated to carry into effect the policy and design of the Legislature in adopting the constitutional amendment. The object to be accomplished was the suppression of a great moral evil, and to effect so praiseworthy and laudable a purpose, the construction should be a benign and liberal one. A limited interpretation of the Constitution, confining the prohibition to legislative grants, whilst it would be inefficient and inoperative in alone suppressing the mischief, by leaving the door still open to foreign lotteries, would at the same time impute to the Legislature the folly and absurdity of accomplishing the contemplated object only by halves. It is true, the title of the act is calculated to give countenance to such a confined and limited construction—"it is to amend the Constitution, so far as relates to the power of the Legislature to grant lotteries." But the title of the act, and the preamble

to the act, are, strictly speaking, no part of it, though they may be resorted to in explanation of the enacting clause, if it be doubtful; or to restrain its generality, when it would be inconvenient if not restrained.   This is the whole extent of the influence of the title and preamble in the construction of a statute.   See 1 *Kent's Com.* 460, 461.   The same author says, that "the true meaning of the statute is generally and properly to be sought from the body of the act itself."   Looking therefore in this case to the body of the act for the meaning of the Legislature, we think that their intention is too clearly expressed to admit of controversy; and that such intention was a total suppression in future, of all lottery grants by the Legislature; and of all licenses to deal in lotteries by the Lottery Commissioners, or sales of schemes by them.   In adopting the constitutional enactment of 1839, it was not the design of the Legislature to interfere with existing private lottery grants, or to restrict or impair the powers it before possessed of regulating the same, or modifying or changing the means or mode by which such grants might be more effectually or speedily accomplished.   Such legislation would promote rather than conflict with the constitutional provision, and tend to  hasten the epoch when to draw a lottery in Maryland was no longer tolerated by law.

ORDER REVERSED AND CAUSE REMANDED.