BENDER, ET AL. *v.* ARUNDEL ARENA, INC., ET AL.

[No. 710, September Term, 1966.]

182

*Decided December 6, 1967.*

*Motion for rehearing filed on December 22, 1967, denied on January 2, 1968.*

184

The cause was argued before HAMMOND, C. J., and MAR-
BURY, McWILLIAMS, FINAN and SINGLEY, JJ.

*Rufus King* for appellants.

*Ward B. Coe, Jr.,* with whom were *Charles B. Keenan, Jr.,
Anderson, Coe & King,* and *Rouse & Beardmore,* and *John A.
Blondell,* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court. McWIL-
LIAMS, J., dissents.

The appellants are members of the Citizens Committee of
Anne Arundel County, Inc., which for some years has been try-
ing to have declared illegal commercial bingo games and coin-
operated gambling devices licensed by the County Commission-
ers of the County under enabling statutes of the General As-
sembly. The Association and some of its members in Decem-
ber 1961 sued in the Circuit Court for Anne Arundel County
to enjoin the County Commissioners from issuing licenses for
the operation of slot machines, payoff pinball machines, console
machines and commercial bingo, alleging that the County ordi-
nances, and resolutions passed thereunder purporting to autho-
rize such licenses, were unconstitutional. The complainants con-
tended that they had standing to sue, that the legislative en-
abling acts were never intended to authorize the licensing of
gambling devices, that the titles of the legislative enabling acts
are misleading in violation of Art. III, § 29, of the Constitution
of Maryland, that the acts authorize lottery grants in violation
of Art. III, § 36, of that Constitution, that the acts constitute an
unlawful delegation of legislative power, and that they are in-
valid because they purport to be regulatory measures but actu-
ally are revenue measures. In an opinion filed in early 1963,
Judge Macgill found it unnecessary to pass on the complainants'
standing to sue since he decided against them on the merits on
every point.

In the appeal to this Court, *Citizens Committee of Anne*

*Arundel County, Inc. v. County Commissioners of Anne Arundel County,* 233 Md. 398, we found that the appellants had no standing to sue and therefore found it unnecessary to consider the merits of the case.

Undaunted, various members of the Association in May 1964 played bingo, electric console machines, slot machines and pinball machines at the premises of various licensees in Anne Arundel County, and as they had anticipated lost varying amounts of money. The players thereupon sued the bingo licensees to recover $50.00 for every card they had played in reliance on Code (1957), Art. 27, § 359, found under the sub-title "Lotteries," which provides that any person who gives money for any "lottery ticket, certificate, or any other device" by which the vendor promises that he will pay the purchaser money "on the happening of any contingency in the nature of a lottery" may recover from the person to whom he gave the money $50 for every lottery ticket he bought. Those who had lost money on the machines sued the machine licensees to recover their losses under Code (1957), Art. 27, § 243, providing that "Any person who may lose money at a gaming table may recover back the same as if it were a common debt * * *." The total amount sued for is some several hundred thousand dollars.

The defendants pleaded that they were holders of lawful and valid licenses issued by Anne Arundel County, duly entitled to conduct bingo games and maintain and offer to the public for play coin-operated gambling devices in that County, and that they never promised as alleged and were not indebted as alleged.

Each side moved for a summary judgment, supporting its motion by affidavits, a stipulation as to applicable ordinances, resolutions, rules, official reports, studies and other public acts, and exhibits. Judge Sachse gave judgment for the defendants in a thorough opinion which in all essentials agreed with that of Judge Macgill in the prior case. We think Judge Sachse was right.

The appellants' contention that the legislature has never intended to confer, nor has conferred, authority on the County Commissioners of Anne Arundel County power to license commercial gambling, but only to license "amusement" devices, falls

apart when the legislative acts in question and the official and judicial views of their meaning are examined.

Chapter 321 of the Laws of 1941 gave the Commissioners power to license "any * * * amusement device * * * whenever any such * * * amusement device is not * * * specifically prohibited from being operated therein [in Anne Arundel County], by the Public General or Public Local Laws * * *." Under this act, if the amusement device is to be used as a gambling device it would not be licensable as the appellants contend. However, by Ch. 321 of the Laws of 1943 the Commissioners were given the power to determine what "amusement devices" may or may not be allowed, and the further specific power to permit "any prize or award in the operation of any * * * amusement device * * * for skill or score attained." In addition, the 1943 statute repealed, as far as Anne Arundel County is concerned, various provisions of the "Gaming" subtitle of Art. 27 of the Code, including § 244 (then 299) ("All games, devices and contrivances at which money or any other thing shall be bet or wagered shall be deemed a gaming table * * *"), § 237 (then 288) (which makes it unlawful to keep "any gambling table, or any house, vessel or place, on land or water for the purpose of gambling"), § 238 (then 289) (certain outmoded games and "any other kind of gaming table * * *, at which any game of chance shall be played for money * * *, shall be deemed a gaming table"), and § 245 (then 300) (prohibiting gambling at cards or dice games or "any other device or fraudulent trick whatsoever * * *"). The 1943 statute also repealed all inconsistent laws to the extent of their inconsistency.

Chapter 1013 of the Laws of 1945 went further to provide that nothing in any of the sections of Art. 27 of the Code (listing them by number), codified under the subtitle "Gaming," "shall be construed to prohibit or make unlawful the operation of any amusement, contest, meet or event, or the participation in any award or wager upon the result of any such amusement, contest, meet or event, operated pursuant to regulations adopted pursuant to the powers granted * * *" by the 1941, 1943 and 1945 acts repealing gaming prohibitions.

The General Assembly has repeatedly shown recognition that coin-operated gambling machines and commercial bingo have

been legalized in Anne Arundel County. The County Commissioners have from time to time, beginning in 1943, provided for their licensing. With these local authorizations and the actual open operation of coin-operated gambling machines and commercial bingo under its very eyes, the legislature, by Ch. 625 of the Laws of 1949, authorized further exercise of local discrimination in the granting of licenses "under the authority of [the 1941, 1943 and 1945 acts] * * * (including Bingo)." The phrase as to bingo is twice repeated in the 1949 statute and is twice repeated in a similar statute, Ch. 3 of the Laws of 1954.

The County resolutions and Public Local Laws licensing gambling were formally legalized by Ch. 334 of the Laws of 1957. Chapter 43 of the Laws of 1958 (Special Session) outlawed betting on "Jai Alai" in Anne Arundel County but included a savings clause for "bingo" and "slot machines." Chapter 800 of the Laws of 1959, dealing with admissions and amusement taxes, made special provision for Anne Arundel County and said that "Bingo" is not to be considered an amusement device.

In 1962 Governor Tawes appointed the Emory Committee to study legalized slot machines and commercial bingo and recommend procedures to eliminate the machines with the least possible damage to the economy of the counties in which they were legal. The Committee's report refers to the fact that in Anne Arundel, Calvert, Charles and St. Mary's Counties gambling by means of slot machines had been legalized and that there were nine lawful commercial bingo operations in Anne Arundel County, saying that "it would seem inconsistent to abolish legalized gambling by machines and retain legalized gambling by commercial bingo establishments." By Ch. 617 of the Laws of 1963 the legislature passed a law to phase out slot machines over a period of years in the four counties but did nothing as to commercial bingo in Anne Arundel County.

Judge Macgill's opinion that gambling had been legalized in Anne Arundel County was shared by Judge Chesnut, who said in 1952 in *Smith v. McGrath* (D. Md.), 103 F. Supp. 286, 288, in referring to "machines and devices for the amusement" of patrons of the plaintiffs, the "operation of all gambling devices possessed by the plaintiffs are lawful in * * * Anne Arundel

* * *." In *McGowan v. State,* 220 Md. 117, 124, which upheld the repeal of the Sunday blue laws as to places of amusement in Anne Arundel County, the Court referred to "slot machines, pinball machines, and bingo games," and said: "What is permitted all comes within the category of recreation." In affirming, the Supreme Court in *McGowan v. Maryland,* 366 U. S. 420, 426, 6 L. Ed. 2d 393, 399, said: "some people will prefer alcoholic beverages or games of chance to add to their relaxation * * *."

It seems clear that the legalization of some forms of gambling in Anne Arundel County had the effect of disallowing any civil recoveries against the gambling establishments there licensed. The 1943 Act did not expressly repeal § 243 (then 298) of Art. 27 which allows a gambling loser to recover his losses but it did repeal all inconsistent laws, and the 1945 Act provided that nothing in §§ 237 to 246, inclusive, (then 288 to 301) of Art. 27, subtitle "Gaming," shall "prohibit or make unlawful * * * the operation of any amusement, contest, meet or event, or the participation in any award or wager upon the result [thereof] * * *."

Gambling, unless it became a public nuisance, and gaming contracts were lawful at common law. In *LaFontaine v. Wilson,* 185 Md. 673, 678, the Court said:

> "by the Statutes of Charles [16 Car. 2 Cap. 7 in 2 Alexander's British Statutes (Coe's ed. 1912 p. 643)] and Anne [9 Ann. Cap. 14, 2 Alexander, supra p. 932] certain forms of wagering were made illegal [although not criminal], and recovery by a winner was denied."

The Statutes of Charles provided for recovery of damages trebling the amount lost in excess of 100 pounds (one-half to go to the Crown), in a civil suit by a loser in a fraudulent game. The Statutes of Anne voided notes given for gambling debts and provided for treble damage suits for losses in excess of 10 pounds. Section 243 of Art. 27 is a similar statute by which "certain forms of wagering were made illegal." To permit a civil recovery for gambling losses is legislative recognition that the gambling which produced the loss was illegal. It would not only be futile, it would be a contradiction in terms to say that a wager

lawfully could be made but if the licensed gambling establishment won the wager it could not keep the stake.

The legislature must be deemed to have made § 243 of Art. 27 of the Code unavailable to one who gambles in Anne Arundel County at a licensed gambling establishment.

The appellants say that even if this be so, and even though they sued in this case to recover their losses on gambling machines under the provisions of § 243, that both the machines and bingo are lotteries and, therefore, they can recover $50 under § 359 of Art. 27 for every coin they put in a machine and for every bingo card they played because there has been no legislative repeal of § 359 or of any other statute under the "Lotteries" subtitle of Art. 27.

The answer to this argument seems simple and plain. The legislature has always considered the forms of gambling it permitted to be made legal in Anne Arundel County to be gambling *games* or in the nature of a *gaming* table, within the purview of the proscriptions of the provisions of the Code grouped under the subtitle of Art. 27 entitled "Gaming," and has never considered those forms of gambling to be *schemes* in the nature of a lottery prohibited by or within the purview of the provisions of the Code grouped under the subtitle of Art. 27 entitled "Lotteries."

Most states have held coin-operated gambling machines and bingo to be lotteries, finding that they combine the classic elements of a lottery of consideration, chance and prize. These states take the view that their constitutional and legislative provisions use the term "lottery" in its generic sense; other states have given the term a more restricted, precise and technical meaning. Maryland would seem always to have chosen the latter course, and to have drawn a definitive distinction between *games* of chance and *schemes* of lottery.

In essentially the same form as they now are, the "Gaming" laws (§§ 237 to 246 of Art. 27) and the "Lottery" laws (§§ 356 to 371 of Art. 27) have been on the books since long before the first Code, that of 1860. Officials and courts in Maryland appear to have considered (a) that the lottery laws covered schemes for awarding a prize by lot or chance in which the only direct or personal participation by the seeker of the prize

is his purchase of a ticket or its equivalent; and (b) that the gaming laws covered gambling by games of chance or gaming tables, as broadly defined (even though skill plays no part), in which the player participates personally and directly and is present when the game ends and the result becomes known.

In *Smith v. State,* 68 Md. 168, evidence of sales of pieces of paper, commonly known as "policies" entitling the holder to receive a specified sum if certain numbers later were drawn, was held to be relevant evidence in a lottery prosecution. *Boyland v. State, 69* Md. 511, involved a similar indictment. The tickets sold were headed "Horse Combination" and the purchaser bought them in the hope she would win forty times what she paid if the numbers she held came up later in a horse race. The Court held the tickets to be lottery tickets. *Ballock v. State,* 73 Md. 1, involved a typical lottery scheme of the Austrian government to promote the sale of its bonds by paying each year a premium over the amount of the bond if the number on a holder's bond were drawn. The bonds were equated by the Court to lottery tickets. *Shelton v. State,* 198 Md. 405, had to do with "numbers slips"; the "numbers game" is clearly a lottery.

On the other side of the coin offenses against the gambling laws involving machines or mechanical devices have always, as far as the Court is aware, been prosecuted by Maryland State's Attorneys under the gaming and not the lottery laws. Various Attorneys General have held or assumed that gambling machines violated the gaming statutes with no suggestion (except in one letter—Vol. 8, Op. A. G. 100) that they offended the lottery statutes.[1]

Moreover, 25 Opinions of the Attorney General 425 found that bingo, licensed in Baltimore under the local exempting statute, was lawful, with no hint that it might be a lottery or that the exempting statute might amount to an unconstitutional lottery grant. The Court in *Brown v. State,* 210 Md. 301, and *Hunter v. State,* 193 Md. 596, reiterated what earlier cases had

---

1. See following opinions of the Attorney General: Vol. 5, 114, 116; Vol. 10, 158, 211; Vol. 13, 230; Vol. 15, 256; Vol. 19, 221; Vol. 22, 334; Vol. 34, 141.

held, that gambling machines are to be treated as gaming tables,. proscribed by the "Gaming" statutes.

Bingo, another name for the game called lotto in England (and sometimes keno in this country) is a game of fairly recent popularity.[2] Scarne, *Complete Guide to Gambling,* p. 185 (Simon and Schuster, 1961), says that it was not generally played in the United States until 1928. It has grown rapidly and tremendously since then. By Chapters 701 and 716 of the Laws of 1939 (now §§ 247 and 260, respectively, of Art. 27 of the Code) the legislature authorized the playing of bingo in Allegany County and Baltimore City for the raising of money for churches, charitable and fraternal enterprises, and volunteer fire companies. Since then the legislature has authorized bingo games for similar purposes in fourteen more counties. The legislative authorizations are found in §§ 247 to 261B inclusive of Art. 27 of the Code under the subtitle "Gaming," and each of them begins either by saying that: "Nothing in this *subtitle* shall be construed to make it unlawful * * * to operate * * * a *game* of bingo * * *," or by saying that: "Notwithstanding the provisions of this *subtitle,*" etc. (Emphasis supplied.) None refers. to the lottery statutes. Had the legislature considered bingo to be in the nature of a lottery, either the exemption statutes would have been legislatively placed under the lottery subtitle or under both the gaming and lottery subtitles, or the exempting acts would have read "nothing in this *Article*" rather than "nothing in this *subtitle.*"

It would be strained fancifulness to ascribe to the legislature

---

2. 14 Encyclopaedia Britannica, "Lotto" p. 405 (14th ed. 1929)
Webster's Third New International Dictionary defines "lotto" as:.
"a game played usu. for a pool with cards bearing rows of
numbers in which a caller draws numbered counters from
a stock and each player covers the corresponding numbers
if they appear on his card, the winner being the one who
first covers one complete row."
Compare the definition Webster gives for a "lottery":
"1: a scheme for the distribution of prizes by lot or chance;
*esp*: a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to
win them usu. as determined by the numbers on tickets as
drawn of random (as from a lottery wheel) * * *."

an intention to allow churches, charitable and fraternal organizations, and volunteer fire companies lawfully to make money by operating bingo games and at the same time permit a player at the game to sue the church, the charity or the fire company for $50 for each card he had played. It would be no more reasonable to read the laws authorizing commercial gambling in Anne Arundel County, from which the County was to receive substantial income from license fees, to permit each player to sue for $50 for every coin put in a gambling machine or for every bingo card he played. Obviously, there would be no commercial gambling if this could be done, and equally obviously, the legislature and the County Commissioners intended that there be commercial gambling in the County. Section 359 of Art. 27 of the Code must be held to have no application to the present legalized gambling in Anne Arundel County.

All lottery is a form of gambling but all gambling need not be legislatively considered to be or actually be lottery, and although some, perhaps many, gambling games, including machines and bingo, have elements of lottery they have not been considered as coming or held to come within the purview of the lottery statutes. We think likewise that the legalization of the gambling games here involved was not forbidden by the command of Art. III, § 36 of the Constitution of Maryland, that: "No lottery grant shall ever hereafter be authorized by the General Assembly."

In the latter part of the eighteenth century and the first half of the nineteenth century, Maryland's legislature, in common with those of many other states, passed some one hundred fifty special acts to authorize lotteries intended to raise money for specific charitable, religious or public purposes. Generally the acts named individual trustees who were, after giving bond, to conduct the lottery in order to raise a stated amount. These were known as lottery grants. Chapter 59 of the Laws of 1791 gave the Commissioners of Baltimore exclusive authority to conduct an annual lottery not exceeding 3500 pounds net to pave streets and clean the harbor, and forbad any other lottery in the City. Chapter 154 of the Laws of 1817 provided for the termination of all lotteries theretofore granted, for a 5% tax to the state on all lottery prizes, and for the establishment of three

Commissioners of Lotteries to be appointed by the Governor and Council with detailed powers to supervise and regulate lotteries.

By Ch. 129 of the Laws of 1828 it was made unlawful for any person to draw any scheme of a lottery unless approved by the Lottery Commissioners who were directed not to approve any such scheme unless proposed by the Commissioners themselves on behalf of the state or "expressly *granted* by the general assembly." By the Laws of 1831, Ch. 79, the Lottery Commissioners were authorized "to *grant* * * * licenses * * * to sell, not only tickets in * * * schemes * * * of lotteries," which they formed or authorized for the benefit of the state, but also to sell tickets in any such "scheme" granted by any state or by the United States. Licensees had to pay $5,000 and to contract to draw a scheme which would net the state at least another $15,000. The state was in the lottery business. Chapter 205 of the Laws of 1835 directed the Lottery Commissioners to "take all *grants* of lotteries now existing * * * and draw the lotteries or dispose of the schemes, under such grants, in the same manner as they draw or dispose of the State schemes * * *," and pay over the money "to be applied to the purposes of *such grants.*" (All emphasis added.) This Act clearly shows the contemporary meaning and understanding of "lottery grant" to have been the granting of special authority to conduct a lottery to raise a stated sum for a specific, worthy purpose.

A constitutional amendment which became effective in 1840 (proposed by Ch. 31 of the Laws of 1839 and confirmed by Ch. 261 of the Laws of 1840) provided that "no new grant to authorize the drawing of any lottery or the traffic or dealing in lottery tickets, or schemes or devices in the nature of lotteries, or the distribution of money or property by chance, shall be made." The clear purpose of the amendment was to end the powers granted the Lottery Commissioners and the Court in *Lucas v. McBlair,* 12 G. & J. 1, 17, so held in 1841 as follows:

"The prohibition [of the amendment], therefore, was not exclusively confined to grants of lottery privileges by the Legislature, but was manifestly intended to cover the whole system of dealing in lotteries, and to prohibit likewise the granting of licenses to sell tickets by

the Lottery Commissioners and the sale of schemes by them."

The later Constitutions of 1851, 1864 and 1867 included the same bare prohibition against authorization by the legislature of lottery grants, although in the Constitution of 1851, the provisions as to "Sundry Officers" in Art. VII, § 5, added that "no lottery scheme shall be drawn for any purpose whatever, nor shall any lottery ticket be sold in this State * * *"; and in addition the Commissioners were directed to extinguish "all existing lottery grants" by 1859. This section offers a stark contrast between the broad provisions prohibiting all drawings of lottery schemes and the sale of any lottery ticket and the narrow reference to unterminated, previously chartered ticket lotteries as "existing lottery grants." The contrast is made graphic by the fact that the 1864 and 1867 Constitutions contained no broadly stated prohibitions against drawing of lotteries and selling lottery tickets, as did the 1840 amendment and the 1851 Constitution but only the narrow language prohibiting legislative authorization of lottery grants.

These contrasts are made more graphic by the history of § 36 of Art. III in the Constitutional Convention of 1867. Perlman's *Debates of Maryland Constitutional Convention* of 1867, p. 89, shows that on May 21, 1867:

> "On motion of Mr. Vansant, it was
>
> *Ordered,* That the committee on the legislative department inquire into the expediency of engrafting into the constitution an article inhibiting lottery grants *and* the sale of lottery tickets, of whatever kind, or policies of risk, or certificates having in anywise any connection with the drawing of lotteries or schemes of raffle, or gift enterprises, either through agents or otherwise, *and requiring the General Assembly of the State to enact penal laws and prohibitions in that connection."*
> (Emphasis supplied.)

The Convention and the voters of Maryland found it expedient to engraft into the Constitution of 1867 only an article "inhibiting lottery grants" and nothing more.

We are persuaded by the words of § 36 of Art. III of the Constitution, considered in light of their legislative and constitutional history and in the context of the long and by 1867 well recognized distinction in Maryland between gaming and lottery (the same Court which passed on the lottery law in December 1841 in *Lucas v. McBlair, supra,* held in December 1841, in *State v. Price,* 12 G. & J. 180, that an indictment for maintaining a gaming table under what is now § 242 of Art. 27 was valid) that the words "lottery grant" as used in § 36 were intended to mean traditional chartered ticket lotteries engaged in or sponsored by the State. So read, § 36 does not inhibit the legislature from legalizing gaming, nor prevent classification of bingo and coin-operated gambling machines as gaming tables.

The repealing Acts of 1941, 1943 and 1945 are not invalid as violating the requirements of § 29 of Art. III of the Constitution. The fact that the 1941 Act excepts the Sixth District of Anne Arundel County (Annapolis) does not make it invalid. *Mt. Vernon Co. v. Frankfort Co.,* 111 Md. 561. The 1943 and the 1945 Acts revealed that they authorized gambling by recitation in the titles that specified sections of the "Gaming" subtitle of Art. 27 are repealed. *Cf. Bell v. Prince George's County,* 195 Md. 21; and *see Second German American Bldg. Assoc. v. Newman,* 50 Md. 62, 67, *Baltimore v. Fuget,* 164 Md. 335, 346, and *Gibson v. State,* 204 Md. 423, 432.

No unconstitutional delegation of legislative power was made by the repealing Acts. Sufficient standards as to licensees and their premises are spelled out, and court review of the licensing is provided. See *Gordon v. Montgomery County,* 164 Md. 210, which distinguished *County Comm'rs v. Cemetery Co.,* 160 Md. 653, relied on by the appellants. Further, we have held that in a delegation of police power to a municipality guides and standards need not be spelled out. See *LaRoque v. Co. Commissioners,* 233 Md. 329, 336, distinguishing *State v. Greenberg,* 221 Md. 471, which appellants cite in this connection.

Appellants have no standing to raise as a cognizable issue whether the repealing Acts are revenue rather than regulatory measures. *Brown v. State,* 177 Md. 321, 327; *State v. Case,* 132 Md. 269.

196

Appellants have been deprived of no rights under the Fourteenth Amendment to the Federal Constitution. *McGowan v. State*, 220 Md. 117, and *McGowan v. Maryland*, 366 U. S. 420, 6 L. Ed. 2d 393, both *supra.* See also 16 Am. Jur. 2d *Constitutional Law* § 510 (1964).

The Court's decision that licensed gambling in Anne Arundel County presently is lawful does not reflect its views, one way or the other, as to the expediency or wisdom of the legalizing laws and means no more than that the applicable statutes and provisions of the Constitution, as we read them, permitted what was done legislatively and administratively lawfully to have been done.

*Judgment affirmed, with costs.*