903 A.2d 348

F.A.C.E. TRADING, INC. d/b/a Face Card Promotions, et al.

v.

Joel J. TODD, State's Attorney.

No. 112 Sept. Term 2003.

Court of Appeals of Maryland.

July 27, 2006.

David C. Gaskill, Ocean City, for appellants.

William F. Brockman, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, and Laura F. Davies Tilley, Assistant Attorney General, on brief), Baltimore, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, GREENE, JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

ELDRIDGE, J.

The issue in this case is whether games of chance, based upon tickets or coupon cards which can be purchased from a dispensing machine for one dollar each, and which offer consumers the chance to win cash prizes, constitute illegal "gaming devices" or "games" under Maryland Code (2002, 2004 Repl.Vol.), § 12–101(d)(1)(ii) of the Criminal Law Article, and are punishable as misdemeanors under § 12–104 of the Criminal Law Article.[1] We shall hold that the games of chance here

---

1. Section 12–101(d) of the Criminal Law Article states in pertinent part as follows:

"(d) *Gaming device.*—(1) "Gaming device" means:
\* \* \*
(ii) a game or device at which money or any other thing or consideration of value is bet, wagered, or gambled.
(2) 'Gaming device' includes a paddle wheel, wheel of fortune, chance book, and bingo."

Section 12–104 of the Criminal Law Article states as follows:

"(a) *Prohibited.*—A person may not:
(1) keep a gaming device, or all or a part of a building, vessel, or place, on land or water within the State for the purpose of gambling;
(2) own, rent, or occupy all or a part of a building, vessel, or place and knowingly allow a gaming device to be kept in the building, vessel, or place;
(3) lease or rent all or a part of a building, vessel, or place to be used for the purpose of gambling;
(4) deal at a gaming device or in a building, vessel, or place for gambling;
(5) manage a gaming device or a building, vessel, or place for gambling; or
(6) have an interest in a gaming device or the profits of a gaming device.

involved are illegal and punishable under §§ 12–101(d) and 12–104.

## I.

This case was decided in the Circuit Court for Worcester County by a grant of the defendant's motion for summary judgment. As such, " '[w]e review the record in the light most favorable to the non-moving party [here the plaintiff] and construe any reasonable inferences which may be drawn from the facts against the movant.' " *Lee v. Cline,* 384 Md. 245, 248, 863 A.2d 297, 299 (2004), quoting *Walk v. Hartford Casualty,* 382 Md. 1, 14, 852 A.2d 98, 106 (2004). *See,* Maryland Rule 2–501; *Charles County Commissioners v. Johnson,* 393 Md. 248, 263, 900 A.2d 753, 762 (2006); *Jurgensen v. New Phoenix,* 380 Md. 106, 114, 843 A.2d 865, 869 (2004); *Sadler v. Dimensions Healthcare Corp.,* 378 Md. 509, 533, 836 A.2d 655, 669 (2003); *Remsburg v. Montgomery,* 376 Md. 568, 579–580, 831 A.2d 18, 24 (2003); *Rite Aid v. Hagley,* 374 Md. 665, 684, 824 A.2d 107, 118 (2003); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001), and cases there cited.

Appellant, F.A.C.E. Trading, Inc., doing business as Face Card Promotions, is engaged in the business of marketing and distributing Ad–Tabs™. These are coupon cards or tickets which can be purchased from a dispensing machine for one dollar each.[2] With the purchase of these coupon cards, consumers receive discounts on various consumer products and the chance to win cash prizes. F.A.C.E. Trading licenses retail establishments and restaurants in over 30 states to

---

"(b) *Penalty.*—A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment for not less than 6 months and not exceeding 1 year or a fine not exceeding $500 or both."

**2.** The record in this case sometimes refers to the dispensed items as "coupon cards" and sometimes as "tickets." Both names refer to the same items.

carry the dispensing machines, with the coupon cards, for the use of their customers.

One such dispensing machine was located in "Captain's Pizza," a restaurant in West Ocean City, Maryland, licensed by F.A.C.E. Trading to have the machine. That particular machine offered consumers the option to purchase coupon cards or tickets giving them discounts on consumer products ranging from $5.00 to $30.00 from four companies which were Campbell's Soup, Dart World, Sports Bar Clothing and Zippo Brand Products. Different coupon cards related to different products, and the amounts of the discounts, as well as the conditions, varied. In operating the machine, the customer could select which company's products the coupon card would relate to. The coupon cards purchased from the machine also included pull-tabs offering consumers the chance to win cash prizes. The machine was located directly adjacent to a Maryland State Lottery machine. In the windows of Captain's Pizza and on the face of the Ad–Tab™ machine were various advertisements, which in large, bold type informed consumers of the chance to win a cash prize by using the machine. Located on the side of the Ad–Tab™ machine were mail-in cards, which customers could send in for a free chance to win the cash prizes. There was also a toll-free telephone number which could be called for a free entry. The free chance to win was limited to one entry per family per day.

In a letter to F.A.C.E. Trading's attorney dated May 20, 2002, Joel J. Todd, State's Attorney for Worcester County, informed the attorney for F.A.C.E. Trading that "I have instructed my investigator to see to it that the Ad–Tab dispenser located at Captain's Pizza at the White Marlin Mall be removed as soon as possible." In response, F.A.C.E. Trading instituted the present action by filing in the Circuit Court for Worcester County a complaint for a declaratory judgment and injunctive relief against the State's Attorney. F.A.C.E. Trading requested the court to declare that the Ad–Tab™ machine and the coupon cards did not constitute illegal gaming and/or lottery and to enjoin the State's Attorney from

prohibiting or interfering with the sales and marketing of the coupon cards in Captain's Pizza.

After commencement of the action, the State's Attorney, represented by the Maryland Attorney General's Office, filed a motion for summary judgment with supporting affidavits, asserting that the material facts were undisputed.[3] One such affidavit was from Thomas V. Manzari, an investigator for the Maryland State Lottery Agency. Mr. Manzari stated that on March 14, 2002, he traveled to Captain's Pizza in response to a report filed by a field representative about the presence of an illegal lottery machine. Mr. Manzari stated that, upon arriving at Captain's Pizza, he "saw a pull-tab machine that had pull-tab tickets inside it. The machine displayed a sign that said you could win various amounts from $50 to $200." Mr. Manzari also stated that he inserted $20.00 into the machine and received 20 tickets. The 20 tickets consisted of four different types, one of which was "entitled 'Double Money II.'" Four of the 20 tickets were one dollar winners, and he cashed in three of them, receiving three dollars from Terry Koshi, a person who identified herself as the manager of Captain's Pizza. According to Mr. Manzari, "Terry Koshi kept the three winning tickets after she paid me for them." Mr. Manzari further stated that "[t]he front of the dispenser machine did not refer to receipt of merchandise, discount coupons, or free tickets" and that he did not see any reference elsewhere on the machine or on the front of the tickets to those alleged offers. He said that the front of each ticket referred only to the chance to win cash prizes along with the logo of the companies offering the discount coupon. The product discount information was on the back of each ticket.

Additionally, the State attached the affidavits of Jeff R. Mayne, an investigator for the State's Attorney for Worcester County, and Ruth Geddie, a District Manager for the Maryland State Lottery Agency. Both Mr. Mayne and Ms. Geddie stated that the machine on the premises of Captain's Pizza

---

3. Hereafter, the State's Attorney and the Attorney General's Office will simply be referred to as the "State."

dispensed pull-tab tickets for one dollar each, that the front of the machine contained an advertisement offering consumers the chance to win cash prizes, and that neither the front of the machine nor the fronts of the tickets contained any mention of product discounts, free tickets or receipt of merchandise. Mr. Mayne said that he "put $1.00 into the machine and received a ticket entitled 'Double Money II,'" and that he "was able to choose between different styles of tickets." Mr. Mayne further stated that when he visited Captain's Pizza on March 20, 2002, there were free entry forms affixed to the side of the machine which could be used by consumers to obtain free chances to win cash prizes.

In its motion and supporting memorandum, the State argued that the Ad–Tab™ machine constituted an illegal slot machine under Maryland Code (2002, 2004 Repl. Vol), § 12–301 of the Criminal Law Article. The State also argued that the game of chance involving the coupon cards and the machine constituted illegal gaming under § 12–101(d) of the Criminal Law Article, and constituted an illegal lottery under §§ 12–201 *et seq.* of the Criminal Law Article. The State requested the court to enter a declaratory judgment that the machines were illegal slot machines, and that the scheme constituted illegal gaming and/or lottery. The State argued that the Ad–Tab™ machines and the cards themselves had all the elements of illegal gambling, namely that consideration is given for the chance to win a prize or reward. The State further alleged that the product discounts provided for on the backs of the coupon cards that were being sold were merely pretexts for illegal gambling activities.

F.A.C.E. Trading responded by filing its own motion for summary judgment and opposition to the State's motion, with supporting affidavits. F.A.C.E. Trading argued that the Ad–Tab™ machines were not slot machines because they did not fit within the definition of "slot machine" set forth in § 12–301 of the Criminal Law Article. F.A.C.E. Trading further argued that the coupon cards did not constitute illegal gaming and/or lottery devices because they offered consumers the opportunity to purchase valuable products at discounts and

that the chances to win cash prizes were merely incidental to the purchases of the products. F.A.C.E. Trading contended that the advertisements, some of which are contained in the record, made clear that the purpose of the machine was to dispense coupon cards for discounts on various products. Furthermore, F.A.C.E. Trading claimed that the existence of mail-in cards and a toll-free telephone number, which consumers could use to obtain free chances to win the cash prizes, confirmed that the promotion did not constitute illegal gambling.

The advertisements, which F.A.C.E. Trading described in its motion and attached affidavits, were posters and placards in the windows of Captain's Pizza, inside the restaurant, and on the front of the machine. They informed consumers that coupons were available for such things as a ten dollar discount on a case of Campbell's Soup or Pork & Beans, thirty dollars in discounts on sports clothing from "Sports Bar," and discounts on merchandise from "Dart World." [4] The signs also stated that no purchase was necessary for the chance to win a cash prize. Consumers were referred to the mail-in forms and to the toll-free telephone number which they could use to obtain free chances to win.

Attached to F.A.C.E. Trading's motion for summary judgment and response were the affidavits of Sandra Mitchell, President of F.A.C.E. Trading, Kenneth Glass, President of Wholesale Communications, Inc., and Robert Mitchell, President of Y.M. Ad Inc., companies which advertise and market products using Ad–Tab™ coupon cards. Each of the three affiants stated that the Ad–Tab™ promotion offers consumers valuable products, namely coupon cards worth at least five times the amounts paid for them, providing for product dis-

---

4. Whether the front of the machine contained advertisements or information regarding the product discounts seems to have been a disputed factual issue, with the affidavits filed by the State disagreeing with the affidavits filed by F.A.C.E. Trading. In accordance with the summary judgment principles previously mentioned, we shall assume that the front of the machine did exhibit advertisements or information regarding the product discounts.

counts from reputable retail and/or wholesale establishments. They further stated that, pursuant to the licensing agreements, entry in the chance to win portion of the coupon card game was with a "no-purchase necessary" qualifier offering consumers mail-in cards and a toll-free telephone number which they could use to receive free chances to win cash prizes up to $300.00. This was advertised to consumers through the use of posters, starbursts, placards, and was even printed on the tickets themselves. Furthermore, the affiants stated that this form of advertising is conducted by several major corporations with a presence in Worcester County, including, McDonald's, Burger King and Coca–Cola, yet none of those companies' promotional schemes had been challenged.

Most of the advertisements for the Ad–Tabs™ in Captain's Pizza, however, failed to specify the nature of the discounts which the coupon cards offered, the steps that had to be taken to redeem the coupon cards, or the type of merchandise that could be purchased with the cards. For example, when a consumer purchased a coupon card with Campbell's Soup discount information on the back, the consumer was required to send the card and sixteen dollars to Campbell's Soup, indicating which type of soup or beans the consumer wished to purchase, and the case of soup or beans would then be delivered to the consumer's home within 4–6 weeks. The advertisements failed to indicate to the consumer, before he or she purchased the coupons, the types of soup or beans that were being offered, the requirement of sending in an additional sixteen dollars, or that the consumer would not receive the product for at least a month.

Additionally, while a consumer could select which company's products a coupon card would relate to, when the consumer purchased the coupon card he or she did not learn the nature of that company's merchandise until after the purchase was completed and the consumer read the coupon card itself. In fact, one advertisement offered the consumer thirty dollars off clothing from "Sports Bar," but failed to specify that the discount required the consumer to purchase ninety dollars worth of clothing. In contrast, the advertisements for the

chance to win a cash prize were in large, bold print and bright colors, and contained the picture combinations that would produce a winning coupon card. On some of the advertisements, there was either no mention of the product discount portion of the coupon cards, or the reference to that portion was in significantly smaller print than the reference to the chance to win cash prizes.

Also attached to F.A.C.E. Trading's motion and affidavits was a chart from Y.M. Ad Inc., entitled "Coupon Redemption Rates," setting forth the number of Ad–Tab™ coupon cards redeemed on Dart World products, Zippo "engraved money clips," and clothing from Sports Bar Clothing, and the percentage redemption rate for each. Out of 2 million Ad–Tab™ coupon cards sold for Dart World products, 296,010 were redeemed for a 15% redemption rate. Out of 1.7 million Ad–Tab™ coupon cards sold for Zippo engraved money clips, 31,485 were redeemed for a 1.8% redemption rate. Out of 550,000 Ad–Tab™ coupon cards sold for "assorted" Sports Bar Clothing items, 5,483 were redeemed for a 1% redemption rate.[5]

F.A.C.E. Trading argued in its summary judgment motion that the facts of the present case were similar to those in *Mid–Atlantic Coca–Cola v. Chen,* 296 Md. 99, 460 A.2d 44 (1983), where this Court held that Mid–Atlantic's offer of a valuable prize to consumers, who purchased a 6 or 16oz. soft drink with a winning bottle cap, did not constitute an illegal lottery but was incidental to the purchase of the product. The opinion in that case, *inter alia,* pointed out that Mid–Atlantic allowed consumers a free chance to win, and did not raise the price of the products, the purchase of which offered the chance to win a prize during the promotion. The Court in *Mid–Atlantic Coca–Cola* concluded that no consideration was paid for the chance to win the prize.

---

5. Presumably the chart referred to total sales of Ad–Tab™ coupon cards in the 30 plus states in which the coupon cards were sold, and not just sales for a particular locality. The time period covered by the chart was not specified.

The Circuit Court in the case at bar granted the State's motion for summary judgment, filed an eight-page declaratory judgment, and denied F.A.C.E. Trading's request for injunctive relief. The trial court declared that the Ad–Tab™ coupon card game constituted illegal gaming and/or lottery, and that the coupon cards could not be sold in Worcester County. The court further held that the dispensing machine alone did not qualify as an illegal slot machine, as defined in § 12–301 of the Criminal Law Article, because "the element of chance is [in] the Ad–Tabs, not in the operation of the machine." The court distinguished the present case from *Mid–Atlantic Coca–Cola v. Chen, supra,* 296 Md. 99, 460 A.2d 44, stating:

"In *Mid–Atlantic,* a consumer could obtain six no-purchase-necessary chances to win every day. In addition, the campaign was widely publicized and the price of the soft drink remained the same before and after the game.

"However in the instant case, the official rules enunciate that 'participants will be allowed one [free] entry per day per family. . . .' This factual distinction between *Mid–Atlantic* and the case *sub judice* is unavoidable. The obvious implication is that some consumers are required to pay consideration to participate in the game of chance. Accordingly, the element of consideration is present as applied to some, and for that reason the game qualifies as an illegal lottery."

The trial court continued:

"This Court further observes that the undisputed facts support the supposition that the Ad–Tab campaign is a pretext, designed to evade Maryland's gambling statutes. The Court of Appeals has repeatedly noted that it is very difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been held by the courts of this country to be in violation of the lottery or gaming laws . . . in the various States of the Union."

In concluding that the Ad–Tab™ coupon card game constituted illegal gaming and/or lottery, the Circuit Court empha-

sized the "obscure nature" of the product discounts that were being offered and stated that "it is the position of [the] Court that the chance to win money is not incidental to the purchase of [product discount] coupons, but rather the purchase of [such] coupons [is] incidental to the game of chance." As an example, the trial court explained that one coupon card offered the consumer a discount on a Zippo product, but to obtain the product the consumer first had to mail-in three Ad–Tab™ proofs of purchase along with thirteen dollars. The consumer in that instance was never given a complete description of the product, nor was the consumer offered any indication of its value before sending away for the product. Although the record indicated that a small percentage of the coupon cards were redeemed, the Circuit Court concluded that the principal function of the Ad–Tab™ machine-card operation is the game of chance.

F.A.C.E. Trading appealed to the Court of Special Appeals. Before argument in the intermediate appellate court, this Court issued a writ of certiorari. *F.A.C.E. v. Todd,* 379 Md. 224, 841 A.2d 339 (2004).

## II.

F.A.C.E. Trading argues on this appeal, as it did in the trial court, that the game of chance is incidental to the purchase of valuable coupon cards providing discounts on consumer merchandise. F.A.C.E. Trading maintains that the facts of the instant case are similar to those in *Mid–Atlantic Coca–Cola v. Chen, supra,* and that this Court should reverse the decision of the trial judge based upon the holding in that case.

The State relies on the definition of "gaming device" found in § 12–101(d) of the Criminal Law Article, arguing that the illegality of the Ad–Tab™ game is based solely on that definition, and asserting that "the question presented in this case is *not* whether [the] pull-tab game constitutes 'an illegal lottery.'" (Appellee's brief at 9). While noting that the essential elements of all forms of gambling are the same, namely consideration for the chance to win a prize or reward,

the State points out that lotteries have been viewed in a separate category from other forms of gaming. (*Id.* at 9–10). This is because of additional considerations under the Maryland Constitution.[6] The constitutional prohibition against "lottery grants," where applicable, is very sweeping; consequently, the prohibition's applicability has been narrowly construed in more recent cases. The Legislature has exempted various other forms of "gaming," however, from gambling prohibitions and made them legal. *See American Legion Post No. 10 v. State,* 294 Md. 1, 5–9, 447 A.2d 842 (1982) (discussing the distinction under Maryland law between games of chance and lotteries, and pointing out that a "lottery" has a narrow meaning in Maryland); *Bender v. Arundel Arena,* 248 Md. 181, 189–195, 236 A.2d 7 (1967) (same), and cases there cited.

In this Court, therefore, the State concedes that the Ad–Tab™ game at Captain's Pizza does not fall within the illegal lottery prohibition in §§ 12–201 *et seq.* of the Criminal Law Article.

We hold that the Circuit Court correctly declared that the Ad–Tab™ coupon card game constitutes illegal gaming prohibited by §§ 12–101(d) and 12–104 of the Criminal Law Article. The Ad–Tab™ game has all of the elements of gambling, namely that consideration is paid for the chance to win a prize or reward. Unlike the situation in *Mid–Atlantic Coca-Cola v. Chen, supra,* the Ad–Tab™ game of chance is not incidental to the purchase of products. Instead, as the Circuit Court held, the product discount aspect of the operation is merely incidental to the game of chance.

In light of the State's position that the Ad–Tab™ game is not an illegal lottery within the meaning of § 12–201 *et seq.* of the Criminal Law Article, we need not, and shall not, decide

---

6. Article III, § 36, of the Maryland Constitution, provides as follows:
    "**Section 36. Lottery grants.**
      "No lottery grant shall ever hereafter be authorized by the General Assembly, unless it is a lottery to be operated by and for the benefit of the State."

the lottery issue.[7]  Accordingly, we shall modify the declaratory judgment so as to delete the declaration that the Ad–Tab™ game is an illegal lottery and, as modified, affirm.

### III.

Although gambling was not illegal under common law principles, English statutes prohibiting certain types of gambling, and applicable in Maryland, were enacted during the latter part of the seventeenth century and during the eighteenth century.  In addition, gambling prohibitions were enacted by the Maryland General Assembly from the early part of the nineteenth century.  For a comprehensive historical discussion of these statutes, *see La Fontaine v. Wilson,* 185 Md. 673, 678–682, 45 A.2d 729, 731–732 (1946).  *See also State v. 158 Gaming Devices,* 304 Md. 404, 414–425, 499 A.2d 940, 945–951 (1985); *Bender v. Arundel Arena, supra,* 248 Md. at 186–195, 236 A.2d at 10–15.

Section 12–101(d)(1)(ii) of the Criminal Law Article broadly defines a "gaming device" as "a game or device at which money or any other thing or consideration of value is bet, wagered, or gambled," and § 12–104 punishes the keeping, management, etc., of such a game or device.  Moreover, § 12–113 of the Criminal Law Article reinforces this broad prohibition by mandating as follows:  "A court shall construe liberally

---

7. Although we are not bound by an appellee's concession of law, we ordinarily may, in our discretion, assume for purposes of the case before us that the concession is correct, and, therefore, we need not decide the issue.  As the Court stated in *J.I. Case Credit Corp. v. Insley,* 293 Md. 483, 487, 445 A.2d 689, 692 (1982) (footnote omitted),

"[w]here the appellee abandons a ground of support for the decision below by making an express concession in this Court, we need not, in our discretion, undertake a review of the matter conceded.  We exercise that discretion here."

*See Felland v. Digi–Tel,* 384 Md. 520, 530–531, n. 1, 864 A.2d 1027, 1033, n. 1 (2005).  *Cf. Robinson v. Bunch,* 367 Md. 432, 438–439, 441–442, 788 A.2d 636 (2002) (The Court declined to accept the stipulation by both sides that the decision below be reversed on one particular legal ground, but, as to another issue, the Court accepted a party's concession and "proceed[ed] upon the assumption that the" party's position was correct).

this title relating to gambling and betting to prevent the activities prohibited."

The broad prohibition in what is now §§ 12–101 and 12–104, and the mandate of liberal construction in present § 12–113, have been part of Maryland's statutory law since the nineteenth century. The liberal construction requirement was first enacted in 1842, and has been regularly applied by this Court in a multitude of gambling cases. As Judge W. Mitchell Digges emphasized for the Court in *Gaither v. Cate,* 156 Md. 254, 258–259, 144 A. 239, 240 (1929),

> "we take it that section 257 [now § 12–113] is an expression by the Legislature of the policy of the State in respect to the construction of gambling statutes generally, and requires the courts to construe statutes prohibiting and penalizing the use of gambling devises liberally, so as to prevent the mischiefs which the Legislature sought to repress. By that section it was, in effect, stated by the Legislature to the courts that, whenever the Legislature enacted statutes having for their object the repression of gambling, in respect to such statutes the rule of strict construction should be reversed, and the courts should so construe them as to give validity not only to the word, but to the spirit of the law. According to our view, it is incumbent upon the courts to give force and effect to the legislative mandate contained in this section of the Code, and to construe liberally statutes aimed and intended to prevent gambling, or order to effectuate the legislative intent and purpose; and therefore this statutory rule of construction should be applied to all gambling statutes without regard to whether they were enacted before or subsequent to section 257 [now § 12–113]."

*See, e.g., Chesapeake Amusements, Inc. v. Riddle,* 363 Md. 16, 32–33, 766 A.2d 1036, 1044 (2001) (reiterating the above-quoted passage from *Gaither v. Cate, supra); State v. Crescent Cities Jaycees,* 330 Md. 460, 471–472, 624 A.2d 955 (1993) (where we pointed out that courts give "full sway to the legislative intention so clearly expressed in § [12–113] that the gaming law prohibitions be liberally construed to prevent the evils inherent in gambling"); *Ballock v. State,* 73 Md. 1, 7, 20

A. 184, 185–186 (1890) (Instead of the rule "applied to the construction of other criminal statutes, which is a rule of strict construction, . . . the law says this statute is to be construed liberally, in order to prevent" gambling).

This Court in *Brown v. State*, 210 Md. 301, 304, 123 A.2d 324 (1956), held that a restaurant's maintenance of a pinball machine, which a player operated by the insertion of a nickel and attempted to win free games, and where "the player, if he won free games, was given the option of continuing to play, or to receive cash for the free games recorded," violated the predecessor sections to present §§ 12–101 and 12–104 of the Criminal Law Article. The Court emphasized that the prohibitory statutory language

> "include[d] any 'device(s) * * * at which money * * * shall be bet or wagered.' Construing the statutes liberally, we see no reason to confine the application of the statute to those devices that depend upon chance, as distinguished from skill. In its broader aspects, *'playing any game for money is gaming.' Ankers v. Bartlett*, 1 K.B. 147 [1936].'"
>
> *Brown v. State, supra*, 210 Md. at 307, 123 A.2d at 327 (asterisks in original, emphasis added).

In language directly applicable to the facts of the case at bar, the *Brown* opinion continued (*ibid.*):

> "It may be inferred, despite the paucity of evidence as to how the machine worked, that the inducement to play was, in part at least, the chance of gain. The insertion of the money and the operation of the device by the player in the hope of winning a monetary reward in varying amounts, in our view of the Maryland Statute, constitutes a bet or wager, regardless of the element of skill."

Under the above-quoted principles set forth in the *Brown* case, as well as numerous other opinions by this Court, there can be no doubt that the Ad–Tab™ coupon card game, involving the purchase of coupon cards with pull-tabs giving to the purchaser the chance to win cash prizes, would by itself constitute illegal gambling under §§ 12–101(d) and 12–104 of the Criminal Law Article. *See, e.g., State v. 158 Gaming*

*Devices, supra,* 304 Md. at 425–426, 499 A.2d at 951 ("The three elements of gambling—consideration, chance and reward—are thus clearly present in a device which, for a price, and based upon chance, offers a monetary or merchandise reward to the successful player") (footnote omitted); *Shelton v. State,* 198 Md. 405, 410–411, 84 A.2d 76 (1951) (" 'The fundamental point is that in each case [of prohibited gambling] there is the offering of a prize, the giving of a consideration to win the prize, and the awarding of the prize by chance' "). *Cf. Chesapeake Amusements, Inc. v. Riddle, supra,* 363 Md. at 24–25, 766 A.2d at 1040 (The purchases of pull-tab tickets, from a dispensing machine, where the winning tickets entitled the purchaser to cash prizes, concededly met the definition of gambling and would have been illegal if the General Assembly had not authorized instant bingo gambling in the particular county involved).[8]

Nevertheless, the appellant F.A.C.E. Trading argues, as it did in the trial court, that the essence of the operation is the purchase for one dollar each of coupon cards providing discounts on consumer products, that, by "agreement with its advertisers," F.A.C.E. Trading "require[s]" the value of the product discount provided by each card to be "at least five times the cost of the coupon card" (appellants' brief at 8–9), that the cash prize aspect of the operation was "incidental" (*id.* at 14), and that the cash prizes were "advertising inducements to get consumers to purchase [the] products" (*id.* at 13). F.A.C.E. Trading asserts that, because the product discount associated with each coupon card is worth five "times or more the value of the dollar paid for the coupon," and because "no purchase is necessary for the opportunity to win a cash prize," there is "no consideration . . . given for the opportunity to win a cash prize" and, consequently, no illegal gambling (*id.* at 14). As previously mentioned, F.A.C.E. Trading relies entirely on this Court's opinion in *Mid–Atlantic Coca–Cola v. Chen, supra,* 296 Md. 99, 460 A.2d 44.

---

**8.** No statute has been called to our attention which would authorize the Ad–Tab™ coupon card game in Worcester County.

*Mid–Atlantic Coca–Cola* was a certified question case from the United States District Court for the District of Maryland. The issue was whether a Coca–Cola bottling company's summer promotional campaign violated the State's prohibition against lotteries. That promotional campaign offered consumers the chance to win prizes if they opened a Coca–Cola product with an instant win bottle cap, or if they collected bottle caps which when combined, spelled: "Have a Coke and a Smile." Mid–Atlantic Coca–Cola further offered consumers the opportunity to obtain free bottle caps and free chances to win by mailing or calling in a request for the bottle caps to a toll-free telephone number or the address listed on all of the promotional materials. Under the official rules, a consumer could request one cap per person per day. Furthermore, Mid–Atlantic Coca–Cola did not raise the price of its soft-drink products during the promotion. It was a time limited promotion that expired at the end of the summer. This Court held that Mid–Atlantic's promotional campaign did not violate the laws against lotteries or any other statutory prohibition against gambling. The Court explained (296 Md. at 108–109, 460 A.2d at 48–49):

> "[L]ottery's essential element of consideration is absent when, as here, there is no money or other thing of value given or required to be given for the opportunity to receive an award determined by chance. Otherwise stated, where, as here the price for the purchase of the appellant's product is constant before, during and at the termination of the promotion, the fact that some of its purchasers (or non-purchasers) may receive a prize awarded on the basis of chance does not violate the provisions of the Constitution; *Bender v. Arundel Arena*, 248 Md. 181, 195, 236 A.2d 7 or of Article 27, Section 356 *Ballock v. State; Long v. State; Shelton v. State,* all *supra.*
>
> "The prizes are, in short, 'gift[s] entirely unsupported by any valuable consideration moving from the taker,' *Long v. State, supra; Yellow–Stone Kit v. State,* 88 Ala. 196, 7 So. 338 (1890). The distribution of such gifts by chance is not in violation of [the lottery laws].

* * *

"[W]e perceive no subsisting constitutional or statutory prohibition against the distribution of gifts, prizes or gratuities by chance when no consideration or money or other thing of value is given or required to be given by the taker for the right to receive the same."

Except for the minor "free entry" aspect of both cases, the case at bar is significantly different from *Mid–Atlantic Coca–Cola.* In *Mid–Atlantic Coca–Cola,* every purchaser, upon paying for a bottle of the soft drink at a retail establishment, received the consumer product at its normal price. The purchaser could not, at the retail establishment, pay to obtain just bottle caps for the purpose of trying to win cash prizes. Instead, the purchaser could obtain a bottle cap from the retailer only if he or she bought the bottle of soft drink at its usual price. The cash prize, represented by a winning bottle cap, was a bonus accompanying a small percentage of the bottles of soft drink sold. There was no consideration given for the chance to win a cash prize. Furthermore, there was no indication in the *Mid–Atlantic Coca–Cola* case that persons were purchasing bottles of soft drink from establishments, and throwing away the soft drink, because their principal interest was to gamble and try to win cash prizes shown on a few bottle caps. The essence of the transaction in *Mid–Atlantic Coca–Cola* was the purchase of a bottle of soft drink at its regular price. The chance to win a cash prize was clearly incidental.

In contrast, the essence of the Ad–Tab™ coupon card game was the purchase of pull-tab cards giving the purchaser the chance to win a cash prize. F.A.C.E. Trading's own evidence showed that only 1% of the Sports Bar Clothing coupon cards, 1.8% of the Zippo coupon cards, and 15% of the Dart World coupon cards, were redeemed for products. Between 85% and 99% of the persons buying these coupon cards were apparently interested only in gambling for cash.[9]

---

9. In one of the affidavits submitted by F.A.C.E. Trading, the affiant pointed out that a study showed that "nearly 60% of the U.S. popula-

Many other circumstances disclosed by the record confirm that the Ad–Tab™ coupon card game at Captain's Pizza was essentially a gambling game for cash prizes, and that the consumer product aspect of the operation was merely incidental. Thus, a winning ticket could be immediately redeemed for cash at the restaurant. In order to obtain a discounted consumer product, however, the ticket holder was often required to comply with various conditions and to wait a considerable amount of time before receiving the product. For example, as the Circuit Court pointed out, a coupon card for a Zippo product could only be redeemed if two other coupon cards offering the same discount and thirteen dollars were mailed to the company. Also, consumers were not told the value of the product, a Zippo money clip, anywhere on the promotional materials.

In fact, the advertisements at Captain's Pizza generally failed to specify the nature of the product discounts, the steps which had to be taken to redeem the coupon cards, the particular types of merchandise that could be purchased at a discount, or the value of the products. On the other hand, the advertisements for the chance to win cash prizes for playing the Ad–Tab™ game were in large, bold and bright colors, displaying the logos used on each of the cards and the different picture combinations that would win the cash prizes. Some of those advertisements failed even to mention the product discount aspect, or mentioned it in small print as an afterthought to the real purpose, the game of chance.

Also showing that gambling for cash prizes was the essence of the operation is the uncontradicted evidence that the res-

tion shop with coupons while saving shoppers nearly $4 billion per year," that 333 billion coupons were sold or otherwise "delivered" into the "market" for the year 2002, and that the redemption rate for that year was only 1.1%. The affidavit did not, however, indicate what percentage of these coupons were "sold" and what percentage of them were delivered free in the market by coupon sections of newspapers, magazines, etc. Anyone familiar with the number of coupons in the coupon sections of Sunday newspapers would reasonably conclude that the overwhelming percentage of coupons delivered to the market were free.

taurant retained the winning coupon cards which were redeemed for cash, thereby precluding the use of such coupon cards for obtaining discounted products. Furthermore, the Ad–Tab™ machine was directly adjacent to Maryland State Lottery dispensing machines, linking the Ad–Tab™ machine with other forms of gambling. In addition, unlike the product in *Mid–Atlantic Coca–Cola,* there is no evidence that the product discount parts of the Ad–Tab™ coupon cards were ever offered for sale independently of the instant win games.

In sum, the record in this case compels the conclusion that the Ad–Tab™ coupon card game was essentially an illegal gambling operation for cash prizes. To borrow language from our predecessors more than one hundred years ago, the product discount aspect of the operation "is in fact a mere guise under which a gambling transaction may be conducted." *Stewart v. Schall,* 65 Md. 289, 307, 4 A. 399, 401 (1886).

Other courts have reached the same conclusion with regard to the Ad–Tab™ coupon card game. Thus, in holding that the game constituted illegal gambling under a statute similar to Maryland's § 12–101(d), the Colorado Court of Appeals in *F.A.C.E. Trading, Inc. v. Colorado Department of Revenue,* 113 P.3d 1280, 1282 (2005), explained:

"Here, the items to be purchased with the coupons are not displayed anywhere near or on the machine, nor does a customer know what the coupon is for before purchasing the **Ad–Tab.** Thus, the customer does not know what product the coupon will enable him or her to purchase, what the price for the product will be, or whether more **Ad–Tabs** must be purchased to qualify. Hence, the customer takes a risk upon the purchase of the **Ad–Tab.** In addition, the machine advertises the chance to win money, and the emphasis in the advertisement is the 'win cash' slogan, as opposed to the purchase of merchandise.

"For these reasons, we conclude that plaintiffs' machine is designed to promote the sale of the 'win cash' feature of the **Ad–Tab,** not the coupon feature, and that the coupon is merely incidental to the game portion of the ticket. Accord-

ingly, we agree with the trial court that the **Ad–Tabs** and machines constitute gambling devices that are illegal under the Colorado ... Code...."

*See also F.A.C.E. Trading, Inc. v. Carter,* 821 N.E.2d 38, 43 (Ind.App.2005) ("[T]he trial court did not err in holding that [the product discount aspects of] Ad–Tabs™ are merely a subterfuge for a gambling device"); *Face Trading Inc. v. Department of Consumer and Industry Services,* 270 Mich. App. 653, 717 N.W.2d 377 (2006) ("The sale of Ad–Tabs constitutes the promotion of" illegal gambling under the statute. "Further, the sale of Ad–Tabs ... does not constitute permitted 'promotional activity' under" Michigan law); *Matter of Shorts Bar of Rochester Inc. v. New York State Liquor Authority,* 17 A.D.3d 1101, 1102, 794 N.Y.S.2d 266, 267 (2005) ("Here, there is substantial evidence supporting the inference that purchasers of the 'Ad–Tab' cards sold by petitioners paid their consideration not for the discount coupons on the cards but rather for the opportunity to win prize money").

To reiterate, the Circuit Court correctly declared that the Ad–Tab™ coupon card game here involved constituted illegal gambling under §§ 12–101(d) and 12–104 of the Criminal Law Article.

*JUDGMENT OF THE CIRCUIT COURT FOR WORCES-TER COUNTY MODIFIED AS SET FORTH IN THIS OPINION AND, AS MODIFIED, AFFIRMED. APPEL-LANTS TO PAY COSTS.*