Dear John B. Franzone
You have requested our opinion whether wagering on video replays of "historic" (previously held) horse races, by means of a product known as "Instant Racing," is authorized at race tracks and satellite simulcast betting ("SSB") facilities in Maryland under current law.
In our opinion, Instant Racing is not permitted at race tracks or SSB facilities in the State because it does not constitute pari-mutuel betting, as authorized by the Maryland Horse Racing Act, at those locations.
 I Background
At its monthly meeting on November 20, 2008, the Maryland Racing Commission ("Commission") was presented with a formal request by Cloverleaf Enterprises, Inc. ("CEI")to approve the installation of 50 Instant Racing machines at Rosecroft Raceway.[1] A representative of Race Tech, LLC ("Race Tech"), the creator and owner of the "Instant Racing Pari-Mutuel Wagering System," made a presentation to the Commission about Instant Racing. Various *Page 33 
materials describing and evaluating Instant Racing were also provided to the Commission.[2]
Race Tech offers "Instant Racing" in 12 different game themes. Letter of Eclipse Compliance Testing (November 13, 2008) at pp. 4-9 ("ECT Letter"). At the Commission meeting, CEI indicated that it was proposing to operate the most basic version, known as "Thoroughbred Mania," at Rosecroft.[3] In general, Thoroughbred Mania seeks to re-create for its users some features of the traditional wagering experience associated with live horse racing. To do this, "Thoroughbred Mania" relies on a number of innovations not found in traditional pari-mutuel wagering.
Broadly speaking, "traditional" pari-mutuel wagering is conducted through a central totalizator system which calculates odds for various outcomes in a particular race based upon the wagers received.[4] For each wager, a certain percentage is first deducted as *Page 34 
"takeout."[5] The remainder is then credited to a "betting pool" composed of all other wagers of the same type. For example, any bet for a horse "to win" Race One goes to the "win pool" for Race One. After the race results are ruled "official,"each dollar wagered on the winning horse is entitled to an equal share of the total in the pool. The totalizator system calculates this share or ratio and indicates the payout.
According to RaceTech, Instant Racing also uses betting pools in calculating its payouts. Based on Race Tech's presentation and the materials provided to the Commission, we understand that the "Thoroughbred Mania" version of Instant Racing functions as follows: Players make their wagers through the use of self-service machines, just as patrons at race tracks may do in lieu of betting with a teller. Unlike traditional wagering on horse races, however, in Instant Racing, the patron bets on the outcome of a race that has already been run — i.e., "an actual horse race that was conducted by a licensed U.S. pari-mutuel facility, and that concluded with official results." Race Tech, LLC Memorandum (undated), included in "Proposal for Instant R acing — Rosecroft" (October 17, 2008) ("Race Tech Memorandum") at p. 1. Each self-service machine is connected to a video server that contains data and recordings of past races, which are randomly sent to the individual machines in use.[6] Before making a selection, the player has the opportunity to examine past performance data, originally published on the day the race was held, showing the records of each of the entries at that time.[7] However, information identifying the race, the race track, the horses participating in the race, and the owners, trainers and jockeys of those horses is withheld until after a wager has been made.
To place a wager, an Instant Racing patron attempts to select the first three finishers of the race in exact order. After deducting *Page 35 
the takeout amount, the central totalizator system automatically divides and allocates each wager into various types of pools, in predetermined percentages, that correspond to each type of "win." For example, in Thoroughbred Mania, there are betting pools corresponding to the following outcomes, which are considered "wins":
 • three selections in exact order
 • top two selections in exact order
 • top two selections finishing first, second, or third
 • any of the three selections finishing first and second
 • any of the three selections finishing first and third
 • first selection finishing first
ECT Letter at p. 3. In addition to the betting pools for each type of win, a portion of all wagers is periodically allocated to a kind of reserve pool, called the "seed pool," until the seed pool has reached a pre-determined level.[8]
After the bettor has made selections and placed a bet, the bettor's machine then displays a video of the race. The bettor may elect to view the entire race or only the last few seconds of the race. Upon completion of the video presentation, if the bettor has achieved a particular type of "win," the Instant Racing machine displays the winning results "using entertaining video and/or mechanical displays." Race Tech Memorandum at p. 1.
If a bettor has achieved a particular type of "win," the bettor receives the money from the corresponding pool. Race Tech Memorandum at pp. 3-4. As noted above, the payout amounts vary for different types of "wins" depending upon the difficulty of winning in a particular manner and on the amount of money in the pool for that type of "win" at a particular time. Id. at p. 1. If a bettor loses, the amounts in the various pools continue to accumulate until another bettor, w agering on a different race, wins the particular pool. Id. at p. 4. *Page 36 
Thus, the betting pool for each type of "win" grows as wagers are made and part of each wager is allocated to that pool. When a bettor achieves the type of "win" associated with a particular pool, the bettor is credited with the contents of that pool . Race Tech Q A at p. 4. A prescribed sum is then transferred from the seed pool to the newly depleted pool to ensure that the latter pool contains a pre-determined minimum amount of money. The seed pool thus ensures that the next winner of that betting pool will receive at least that minimum amount. Race Tech Q A at pp. 4-5.[9]
 II Analysis
A. Gambling under Maryland Law
Subject to a number of exceptions, gambling[10] — or gaming, as it is sometimes called — is generally prohibited by Maryland law.See Annotated Code of Maryland, Criminal Law Article ("CR"), § 12-101et seq. In particular, "[a] person may not . . . bet, wager, or gamble . . ." CR § 12-102(a). This section and similar statutory provisions are to be liberally construed to prohibit various iterations of gambling "so as to prevent the mischiefs which the Legislature sought to repress."F.A.C.E. Trading, Inc. v. Todd, 393 Md. 364, 377, 903 A.2d 348 (2006)quoting Gaither v. Cate, 156 Md. 254, 258-59, 144 A. 239 (1929); seealso CR § 12-113. Thus, unless a particular form of wagering clearly comes within an exception to the general ban on gambling, it is not authorized under Maryland law.
One of the exceptions to the general prohibition of gambling is for "pari-mutuel betting conducted under the Maryland Horse Racing Act." CR § 12-107(a)(2)(i). Such betting is regulated under *Page 37 
Title 11 of the Business Regulation Article ("BR"). In asking the Commission's approval to operate Instant Racing machines at Rosecroft Raceway, CEI seeks to come within this exception. See 83 Opinions of theAttorney General 92, 96 (1998) (only pari-mutuel wagering permitted at tracks under the Maryland Horse Racing Act).[11]
B. Pari-Mutuel Betting Conducted Under the Maryland Horse RacingAct 1. Pari-Mutuel Betting
The Maryland Horse Racing Act defines "pari-mutuel betting" as:
 the system of betting in which those who successfully bet on horses that finish in specified positions share the mutuel pool, less the takeout and the breakage.
BR § 11-101(m). "Takeout" is defined as the part of the handle —i.e., the total money bet on a race[12] — "that is not returned to successful bettors but is otherwise allocated under [the Maryland Horse Racing Act]." BR § 11-101(u). The statute limits the amount of takeout[13] and prescribes its allocation.[14] "Breakage" means the *Page 38 
odd cents that remain after all successful bettors are paid to the next lowest multiple of 10 cents. BR § 11-101(b).
In pari-mutuel wagering under the Maryland Horse Racing Act, bettors wager on a particular race, or a series of races. A bettor's wager becomes part of a betting pool, also called a "mutuel pool," for a particular race (or races) depending upon the type of wager made. At the conclusion of the race or races, after the takeout is deducted, the remaining money in the applicable betting pool is shared among the successful bettors.[15] Thus, the odds are set, as near as may be, solely and completely by the bettors themselves, rather than by reference to some external standard or oddsmaking procedure. Bettors are not wagering against the "house," but against each other. In each race, just as the horses compete on the track for a share of the purse, those wagering on the outcome compete amongst themselves for a share of the total wagered. *Page 39 
 2. SSB Facilities
In addition to pari-mutuel betting at race tracks, the Maryland Horse Racing Act authorizes such betting at SSB facilities. The statute defines "satellite simulcast betting" as:
 (1) pari-mutuel betting at a satellite simulcast facility in the State on a race that is simulcast from a sending track by a mile thoroughbred racing licensee, a harness racing licensee, or the State Fair Society; and
 (2) transmission of the pari-mutuel information regarding bets at the satellite simulcast facility to the sending track.
BR § 11-815. A "licensee" (who is authorized to simulcast races to an SSB facility) is "a person who has been awarded racing days for the current calendar year" by the Commission. BR § 11-101(h) and (i). The Commission has jurisdiction over all SSB facilities to the same extent as when live racing is held by a licensee. BR § 11-816(c).
As the statutory definition makes clear, an SSB facility may conduct betting only on races it receives from a race track licensed by the Commission; whether the races are held live at that track or simulcast to that track from outside the State. Therefore, Instant Racing would only be authorized at an SSB facility if it were authorized at a Maryland race track.
C. Whether Instant Racing is Pari-Mutuel Betting
For a variety of reasons, it is evident that Instant Racing is not pari-mutuel betting as contemplated in the Maryland Horse Racing Act, whether at race tracks or at SSB facilities.
1. Betting on Completed Races
Instant Racing is a system for betting on the outcome of races that have already been run. In authorizing pari-mutuel betting under the Maryland Horse Racing Act, the General Assembly has allowed betting on live or simulcast horse races. We are not aware of anything in the legislative history of the Act that suggests that the Legislature considered authorization of wagering on races run in other jurisdictions that had been completed and whose results were *Page 40 
known long before the bets were placed. See 72 Opinions of the AttorneyGeneral 313, 314-19 (1987) (reviewing legislative history).
With respect to SSB facilities, the term "simulcast" implicitly, if not explicitly, refers to an event happening simultaneously with its broadc ast. The term is a shortened version of the phrase "simultaneous broadcast." See Random House Dictionary of the English Language (2d ed. 1987) at p. 1784. Thus, the common understanding of the phrase "satellite simulcast betting" would exclude betting on a race that had already been run and whose results were known. See F.D.R. SrourPartnership v. Montgomery County, ___ Md. ___, 2009 WL 294351 (February 9, 2009) at *6 (statutory terms normally given "ordinary and natural meaning"); see also Wyoming Downs Rodeo Events, LLC v. State,134 P.3d 1223, 1230 (Wyo. 2006) (explaining that Instant Racing is not consistent with the definition of "simulcasting" in Wyoming law).
2. Betting Pools not Pari-Mutuel Pools
In traditional pari-mutuel wagering, those who successfully bet on the same winning outcome share a betting pool. See BR § 11-101(m). This is not the case with Instant Racing. There, individual players — even those using machines in the same location — are each wagering on different races with different horses and different outcomes. A bettor who successfully chooses a winning horse can therefore never "share the mutuel pool" with another who has done the same, for the simple reason that no one else is betting on the same race. In traditional pari-mutuel wagering, only the same type of bets on the same race or series of races are pooled together. By contrast, with Instant Racing, wagers on completely different races are pooled together based only on the various types of "wins" available to the players. Instead of each betting pool being shared by all of those who selected the correct order of finish in a particular race, the Instant Racing winner takes all of the money that has accumulated in the applicable betting pool at the time of that person's successful bet. This may be pooled betting, but it is not pari-mutuel betting as contemplated in the Maryland Horse Racing Act.
Furthermore, bettors in a traditional pari-mutuel system, through their differing opinions and the money wagered on such opinions, participate directly in setting the odds on the various possible outcomes of a given race. Typically, the bettors are the only determinant of what the odds will be. For obvious reasons, thiscannot occur in Instant Racing because, as noted above, no two *Page 41 
players are ever betting on the same race. To the extent the success or failure of other players, or other factors such as the timing of "wins," may influence the size of payouts available in Instant Racing, it does not occur through the same process which is at work in traditional pari-mutuel wagering. Indeed, from the materials provided, it is not always possible to determine what precise method, formula or procedure Race Tech will use to arrive at an appropriate payout in any given situation. What is clear, however, is that the method used is fundamentally different.
3. Seed Pool
A key element of Instant Racing demonstrates why it is not pari-mutuel betting. While the allocation of wagers in Instant Racing provides for a takeout within the statutory limits, it will also frequently include a deduction for the seed pool, a concept foreign to pari-mutuel betting.
Since it is virtually assured that only one bettor will win the contents of a betting pool, Instant Racing provides for the seed pool to replenish betting pools immediately following payout from a win. However, the Maryland Horse Racing Act contains no provision for a "seed pool" as part of the takeout or otherwise; nor is there any reference to such a mechanism in the Commission's regulations. The seed pool is thus a key element of betting pools in Instant Racing, yet does not exist in pari-mutuel betting under the Maryland Horse Racing Act.[16]
The use of the seed pool is also at odds with the treatment of "minus" pools in pari-mutuel wagering under the Maryland statute. In pari-mutuel betting, on rare occasion, there is a minus pool — i.e., the monies in the pool are insufficient to pay a prescribed minimum *Page 42 
for every dollar bet.[17] In such instances, the race track owner is required to pay each successful bettor a prescribed, minimum amount of winnings (typically, five cents on the dollar). See COMAR 09.10.01.66G (thoroughbred races); COMAR 09.10.02.45T (standardbred races).[18]
Instant Racing eliminates the potential for a minus pool by utilizing the seed pool, which is made up of monies wagered by the bettors, as opposed to money supplied by the race track owner.
4. Summary
The betting on horse racing currently authorized under State law involves betting on live races, whether run in Maryland or simulcast into the State. Instant Racing is wagering on completed races. In addition, its betting pools are not pari-mutuel pools as authorized by Maryland law. The concept of a seed pool — a central feature of Instant Racing — is unknown to pari-mutuel wagering under Maryland law. Given that the prohibitions against gambling in State law are to be liberally construed against the authorization of such activity, the Commission may not authorize Instant Racing at race tracks or SSB facilities unless the General Assembly amends current law.
Finally, we note that the only reported court decision that has considered the issue has held that Instant Racing is not "pari-mutuel wagering."[19] See W yoming D owns Rodeo Events, LLC, *Page 43 134 P.3d at 1230-31 (". . . we are dealing with a slot machine that attempts to mimic traditional pari-mutuel wagering. Although it may be a good try, we are not so easily beguiled"); cf. Final Administrative Order adopted in In the Matter of MEC Oregon Racing, Inc. dba Portland Meadows, No. 862 P 500-691 (Oregon Racing Commission April 25, 2008) (concluding that the Thoroughbred Mania version of Instant Racing is not a "mutuel wager" under Oregon law).[20]
 IV Conclusion
In our opinion, Instant Racing is not permitted at race tracks or SSB facilities in the State because it does not constitute "pari-mutuel betting," as authorized by the Maryland Horse Racing Act, at those locations.
 Douglas F. Gansler Attorney General
 Bruce C. Spizler Assistant Attorney General
 Robert N. McDonald* Chief Counsel Opinions and Advice
* Jeffrey Darsie contributed significantly to the preparation of this opinion.
[1] CEI owns and operates Rosecroft Raceway, a harness racetrack located in Fort Washington, Maryland. It is a subsidiary of Cloverleaf Standardbred Owners Association, which represents a majority of the owners and trainers who race standardbred horses at Rosecroft.
[2] Among those materials were pamphlets from Race Tech describing Instant Racing, a memorandum from a New Jersey law firm opining that Maryland law neither authorizes nor prohibits Instant Racing, an analysis of the Instant Racing betting pools by an official of a Canadian horse racing organization, and a review of the Instant Racing system by Eclipse Compliance Testing.
[3] Race Tech currently operates Instant Racing at Oaklawn Park, a mile thoroughbred race track in Arkansas. The operation of Instant Racing in Arkansas was authorized by emergency legislation passed by the Arkansas General Assembly in 1999. That law allowed wagering "on races run at other tracks which are shown live or in any other manner approvedby the [Arkansas Racing] Commission by television or otherwise at locations on the grounds at the Arkansas race track." Act 10 of 1999,codified as amended at Arkansas Code 23-110-405(b) (emphasis added).
[4] Totalizators, calculating machines that can support a pari-mutuel betting system, were first employed at American race tracks approximately 75 years ago and are credited with helping to expand legalized betting on horse races. See Martz, Legalized Gambling andPublic Corruption: Removing the Incentive to Act Corruptly, or Teachingan Old Dog New Tricks, 13 J. Law Pol. 453, 459 n. 36 (1997).
[5] See notes 12-14 below and accompanying text.
[6] Race Tech has an offline video database containing more than 200,000 races; approximately 21,200 satisfy the company's criteria for use in Instant Racing. Race Tech LLC Questions and Answers (undated), included in "Proposal for Instant Racing — Rosecroft" (October 17, 2008) ("Race Tech Q A") at p. 1.
[7] Each race has exactly ten separate wagering interests —i.e., ten different horses upon which the patron can wager. Race Tech Memorandum at p. 1.
[8] This fund is apparently referred to as the "seed pool" because, as explained more fully below, it is used to "seed" or "re-seed" the various win pools with a minimum balance after a payout from the pool. Until the seed pool reaches its operating level, 75% of every dollar wagered is directed to the seed pool.
[9] None of the materials provided to the Commission explains clearly: (1) the amount of money that is to be accumulated in the seed pool in order for it to be deemed "full"; or (2) the amount of money that is to be transferred from the seed pool into a newly-depleted pool following a "win."
[10] The classic elements of gambling are payment ofconsideration for the chance to win a prize or reward. F.A.C.E. Trading,Inc. v. Todd, 393 Md. 364, 374, 903 A.2d 348 (2006); 91 Opinions of theAttorney General 64 (2006).
[11] Among the other exceptions to this prohibition are the State Lottery and the recent authorization for video lottery terminals, sometimes referred to as slot machines, in certain circumstances.See Maryland Constitution, Article XIX; Annotated Code of Maryland, State Government Article, § 9-101 et seq. As CEI's request to the Commission concerns the exception for pari-mutuel betting, we need not catalog all of the various forms of gambling authorized by statute to answer your question.
[12] See BR § 11-101(e).
[13] In thoroughbred racing, for example, the statute caps the takeout as follows:
 • not more than 18% from each regular mutuel pool;
 • not more than 21% from each multiple mutuel pool on 2 horses; and
 • not more than 25.75% from each multiple mutuel pool on 3 or more horses.
BR § 11-514. See also BR § 11-613 (takeout for standardbred racing).
[14] See BR § 11-515 et seq. (thoroughbred racing), § 11-614 through § 11-617 (standardbred racing). For example, BR § 11-515(c) provides that the amount deducted from regular mutuel pools ("not more than 18%") shall be allocated as follows:
 • 7.70% to the race track licensee (operator) from which the race track licensee shall pay 0.25% to the Maryland Race Track Employees Pension Fund
 • 0.32% to the Maryland Racing Commission for State tax
 • 1.10% to the Maryland-Bred Race Fund
 • 7.70 % for purses
 • 0.18% as an additional amount for purses; and
 • 1% to the Maryland Million, Ltd. for Maryland Million races.
[15] The Commission's regulations allow for "carry-over" in some forms of pari-mutuel betting — i.e., if there are no successful bettors regarding a type of bet on a particular race or races, a portion of the monies wagered are "carried over" into the betting pool for that same type of bet the next time it is offered. See e.g., COMAR 09.10.01.73E(2) and 09.10.02.55F(2) ("Pick Six").
[16] The seed pool is distinguishable from a "carry-over" permitted by the Commission's regulations. See note 15 above. A carry-over applies under the Horse Racing Act when no bettor wins whereas part of the seed pool is used to replenish a betting pool in Instant Racing whenone bettor wins. Further, carry-overs in pari-mutuel wagering under the Horse Racing Act are not in a pre-determined or prescribed amount and are not for the purpose of ensuring that another bettor, at a later time, will win at least some minimum amount.
[17] For example, a minus pool may result when many bettors, wanting to make a "sure" bet, wager large sums of money on a horse to finish third, even though the horse is favored to win the race. If that horse finishes third or higher, a minus pool may result.
[18] The race track owner may be required to use its percentage of the breakage toward satisfying the minus pool. See COMAR 09.10.01.66H (thoroughbred); COMAR 09.10.02.45S (standardbred).
[19] Two opinions of the Alabama Attorney General concluded that Instant Racing is not a lottery under Alabama law and that local racing commissions could offer it "if it is otherwise permitted under Alabama's lottery and gambling laws." Ala. Op. Atty. Gen. No. 2009-020 (December 5, 2008); Ala. Op. Atty. Gen. No. 2001-114 (March 13, 2001). Those opinions reasoned that Instant Racing involved elements of skill — a prerequisite for legal pari-mutuel betting under Alabama law. Both opinions assumed, without analysis, that Instant Racing is a form of pari-mutuel betting.
[20] A petition for judicial review of that decision has been filed with the Oregon Court of Appeals. *Page 44